## In re NEW MIDLAND PLAZA ASSOCIATES, Debtor.

### No. 99–25737–BKC–PGH.

United States Bankruptcy Court,
S.D. Florida,
Broward Division.

April 28, 2000.

Gary M. Murphree, Miami, FL, for Debtor.

## MEMORANDUM OPINION CONFIRM-ING DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION

PAUL G. HYMAN, Jr., Bankruptcy Judge.

THIS MATTER came before the Court for hearing on January 14, 19, and 20, 2000, upon the Debtor's Second Amended Plan of Reorganization (the "Plan"), dated December 3, 1999, the Certificate of Plan Proponent on Acceptance of Plan, Report on Amount Deposited, Certificate of Amount Deposited, and Payment of Fees (the "Confirmation Certificate"), and the Confirmation Affidavit of Martin E. O'Boyle (the "Confirmation Affidavit"), filed by New Midland Plaza Associates, the debtor and debtor-in-possession (the "Debtor"), Coolidge's Objection to Confirmation (the "Coolidge Objection"), filed by Coolidge Somerset Alcoa, LLC ("Coolidge"), the Debtor's Response in Opposition to Coolidge's Objection to Confirmation (the "Debtor's Response"), and Coolidge's Memorandum of Law in Opposition (the "Coolidge Opposition Memorandum"). Adequate notice was given.

The Court, having received testimony from Martin E. O'Boyle ("Mr. O'Boyle"), the Debtor's managing general partner, Richard S. Lawrence ("Mr. Lawrence"), MAI, director of Cushman & Wakefield of Georgia, Inc. the Debtor's expert appraiser, Thomas D. Wood, Jr. ("Mr. Wood"), president of Thomas D. Wood, Co., the Debtor's expert witness regarding terms of commercial real estate loans, and Douglas B. Hall ("Mr.Hall"), MAI, of Douglas B. Hall and Associates, Inc., Coolidge's appraiser, having observed the candor and demeanor of the witnesses, having admitted into evidence certain of the Debtor's and Coolidge's exhibits, having heard argument of counsel, having taken judicial notice of the pleadings filed in this case, and being otherwise fully advised in the premises, makes the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

On August 30, 1999 (the "Petition Date"), the Debtor filed for protection under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

On December 3, 1999, the Debtor filed its Plan.

On December 6, 1999, the Court entered the Order Approving the Debtor's Second Amended Disclosure Statement (the "Disclosure Order"), which, among other things, set January 14, 2000 as the date for the hearing on confirmation.

### The Debtor

The Debtor is a Tennessee general partnership. Mr. O'Boyle, the managing general partner, owns 69.13% of the partnership interest in his individual capacity. Mr. O'Boyle has been engaged in the real estate business, including owning and operating shopping malls, for over twenty-five years. The remaining partnership interests are owned by Catherine O'Boyle, Mr. O'Boyle's mother, who owns 0.10%; Commerce Partnership 1147, which owns 26.92%; and Commerce Partnership 1171, which owns 3.85%. Mr. O'Boyle in turn owns 99.9% of the partnership interest of Commerce Partnership 1147 and Commerce Partnership 1171, with Catherine O'Boyle owning the remaining 0.10%.

### New Midland Plaza

The Debtor's primary asset is a 365,000 square foot shopping mall located in the City of Alcoa, Blount County, Tennessee (the "Midland Plaza"). The Midland Plaza was built in various phases beginning in 1962. The Debtor completely rebuilt the facade in 1993. The Debtor acquired the Midland Plaza in March 1988. Mr. O'Boyle manages the significant business activities of the Debtor from his offices at 1280 W. Newport Center Drive, Deerfield Beach, Broward County, Florida. The day-to-day management of the Midland Plaza is performed by Wood Properties, Inc. ("Wood Properties"), the local property management firm, an unrelated third party.

The Debtor financed the purchase of the Midland Plaza with an $8.9 million loan provided by Meridian Mortgage Corporation, secured by a deed of trust on the Midland Plaza and an Assignment of Rents. The loan was modified and extended by written agreement on November 1, 1988, January 12, 1989, December 22, 1992, and January 1, 1996.

As of the Petition Date, First Union National Bank ("First Union") claimed ownership of the loan documents as successor by mergers to CoreStates Bank, N.A., and Meridian Bank, which in turn claimed ownership by assignments from Meridian Asset Servicing Corporation and Meridian Mortgage Corporation.

The Debtor also obtained financing to renovate the Midland Plaza from the City of Alcoa (the "City"), pursuant to a Development Agreement, dated October 25, 1988. The City requested a second mortgage to secure the indebtedness due to the City, to which the Debtor agreed. Under paragraph 14 of the Fourth Loan Modification, dated January 1, 1996, between Meridian Bank and the Debtor, Meridian Bank consented to the Debtor granting the second mortgage. The second mortgage was never executed and recorded because, according to Mr. O'Boyle's testimony, First Union subsequently objected to granting of the second mortgage.

### The State Court Litigation

On its face, the Fourth Loan Modification extended the maturity date of the loan through September 30, 1998. On October 1, 1998, First Union declared the loan in default, alleging that the loan had matured. Litigation concerning the loan is pending in the Circuit Court for Blount County, Tennessee (the "State Court Litigation").

On May 10, 1999, the State Court entered a preliminary injunction enjoining First Union from foreclosing its lien to protect the rights of the Debtor from possible violation by First Union.[1]

---

1. The Memorandum Decision, dated May 10, 1999 (Debtor's Exhibit 24) provides:

> The Court finds that the record indicates to the Court's satisfaction the Plaintiff's [Debtor's] rights are being or will be violated by

> Defendant's [First Union's] foreclosure of the rental property which is the subject of this litigation.

Memorandum Decision pp. 1–2.

On August 25, 1999, the State Court conducted a hearing on the Debtor's request for an extension of the injunction. Before the State Court issued a ruling on the request, however, the Debtor filed for protection under Chapter 11.

With the Debtor's Plan pending, Coolidge, a limited liability corporation, purchased First Union's claim. At the time of the purchase, Coolidge was aware of the State Court Litigation.

### The Debtor's Plan

The Plan recognizes five classes of creditors. Class 1 consists of allowed priority claims (other than priority tax claims under § 507(a)(8)), of which there were none; Class 2 consists of allowed general unsecured creditors in the approximate amount of $318,557.35; Class 3 consists of the allowed unsecured claim of the City in the amount of $1.5 million; Class 4 consists of the Allowed Secured Claim of Coolidge in the amount of $5.4 million[2]; and Class 5 consists of the partnership interests in the Debtor.

The Plan provides that Classes 2, 3, and 4 are impaired within the meaning of § 1124 and are entitled to vote to accept or to reject the Plan.

The Plan provides that each holder of an allowed unsecured claim in class 2 will receive two equal distributions totaling 100% of the allowed claim without interest. The first 50% distribution is due on the effective date of the Plan (not to be later than 45 days following confirmation of the Plan). The second 50% distribution is due on or before June 30, 2000.

The Plan provides that the class 3 claim of the City will receive a non-interest bearing, non-recourse promissory note in the principal amount of $1.5 million with a fifteen-year maturity. The promissory note will be secured by a second mortgage on the Midland Plaza.[3] Payments under the note will equal the greater of $50,000 or 25% of net cash flow per annum from the Midland Plaza, except that the first two years' payments together shall total not less than $250,000, payable before the end of the second year. The above treatment was contingent upon the City's voting to accept the Debtor's Plan. The City voted to accept the Plan.

The Plan provides that Coolidge as holder of the class 4 secured claim will retain its first priority lien in the Midland Plaza and will receive deferred monthly payments based upon a twenty-five-year amortization period with simple interest at 7.5% per annum with a ten-year balloon or under such rate and term as the Court may determine at the hearing on confirmation of the Plan. The amount of the allowed claim of Coolidge would also be subject to a future reduction equal to the amount, if any, of the final judgment obtained by the Debtor against First Union, in the State Court Litigation.

Administrative claims of approximately $245,000 and allowed real estate tax claims of approximately $71,000, entitled to first priority under Tennessee law, will be paid on the effective date.

The Confirmation Certificate, as supplemented *ore tenus* at the hearing, revealed that there was approximately $810,000 on deposit in the trust account of the Debtor's attorneys. This amount was comprised of $250,000 (the "CRO Funds") deposited by Mr. O'Boyle's affiliate CRO Realty, Inc. ("CRO"), solely for the purpose of insuring distributions to class 2 creditors should the Debtor's cash flow be insufficient to do so, and approximately $546,469.76 deposited from the Debtor's debtor-in-possession accounts. The $546,469.76 is more than sufficient to make the initial required distributions under the Plan in view of Mr.

---

**2.** The parties stipulated to this amount for purposes of the confirmation hearing without prejudice to the parties' rights in any further proceeding to determine the exact amount of the claim or the extent, priority, or validity of the asserted lien.

**3.** The promissory note favoring the City may be enforced only against the Midland Plaza and shall not be enforceable against any other asset of the Debtor or against the Debtor or against any of the Debtor's partners including Mr. O'Boyle.

O'Boyle's voluntary subordination of his claims and the claims of CRO. *See* discussion *infra.*

Of the holders of class 2 claims who voted, all voted unanimously to accept the Plan. Thirty-eight unsecured creditors holding claims aggregating $308,983.67 voted unanimously to accept the Plan. The City voted its $1.5 million class 3 claim to accept the Plan.

Coolidge, however, voted its secured class 4 claim to reject the Plan. Coolidge also filed the Coolidge Objection and the Coolidge Opposition Memorandum seeking to deny confirmation of the Plan. This rejection by Coolidge, an impaired class, invokes § 1129(b)(1) and (2), the so-called "cram down" provisions of the Bankruptcy Code.

## II. *STANDARD OF PROOF*

 The Debtor has the burden of proof on each element of 1129(a) and (b). *See In re Stuart Glass & Mirror, Inc.,* 71 B.R. 332, 334 (Bankr.S.D.Fla.1987). The appropriate standard of proof at a hearing on confirmation is the clear and convincing evidence standard, rather than the preponderance of the evidence standard. *See In re Miami Center Assocs. Ltd.,* 144 B.R. 937, 940 (Bankr.S.D.Fla.1992) (Cristol, J.); *but see In re Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1165 (5th Cir.1993) (holding that a preponderance of the evidence is the correct standard for purposes of a confirmation hearing). Preponderance means that the existence of a fact is simply more likely than not, while clear and convincing is a higher standard and requires a high probability of success. *See Briscoe,* 994 F.2d at 1164. The Court respectfully disagrees with the analysis in *Briscoe* and has applied here the higher clear and convincing standard to determine whether the Debtor has met its burden of proof regarding the elements of § 1129(a) and (b)

## III. *MARKET VALUE OF THE MIDLAND PLAZA*

The Debtor presented expert testimony by Mr. Lawrence who valued the Midland Plaza at $8.3 million. Mr. Lawrence conducted a full appraisal, dated January 7, 2000, as revised January 12, 2000 (which revisions did not affect his ultimate opinion as to value), of the Midland Plaza in accordance with the Uniform Standards of Professional Appraisal Practice and personally inspected the Midland Plaza on two occasions.

The Court finds Mr. Lawrence's demeanor, research, and methodology to be very credible. The Court finds the comparables he used to be appropriate and the projections he relied upon to be reasonable, even conservative. Three of five comparables were from the Knoxville area (approximately 12 miles from the City). Mr. Lawrence personally inspected or had personal knowledge of each comparable. His direct capitalization rate of 10.50% not only was derived from his experience in the commercial real estate market over the last year but also was supported by the direct capitalization rates from the comparables. In contrast, Mr. Hall, Coolidge's appraiser, selected a direct capitalization rate without a substantial, credible rational therefore. Mr. Lawrence's discount rate of 13% appears more reasonable than Mr. Hall's, given the Debtor's historical cash flow and the generally good condition of the Midland Plaza.

Mr. Hall had previously performed an appraisal of the Midland Plaza, dated November 24, 1998, on behalf of First Union and valued the property at $6,975,000. While the Court rejects Mr. Hall's valuation, even at this value there appears to be substantial equity in the property.[4]

The Court finds further that Mr. Hall's testimony was not credible. Because the 1998 report is dated and not adequately

---

**4.** In the November 24, 1998 appraisal, Mr. Hall also valued the property at $6,015,000 under what appeared to be a leisurely "disposition" value (assuming a quick resale within six months). This disposition standard does not appear applicable for purposes of determining value for confirmation.

supplemented by sufficient additional research, the Court finds his assumptions to be incomplete, dated, or, in certain instances, contrary to credible evidence regarding the current occupancy rate of the property, the overall trend in that occupancy rate, and the estimates of the costs of necessary capital improvements. Mr. Hall did not revisit the Midland Plaza for purposes of updating his 1998 appraisal. He rated the Midland Plaza a grade C property in part based upon his assumption that the Debtor would not adequately fund necessary capital improvements. This assumption is directly contrary to the substantial amounts budgeted by the Debtor in the Plan for capital reserves, which is $475,000 for year 2000 and $250,000 each year thereafter. Mr. Hall's testimony that necessary capital expenditures would exceed $475,000 was rebutted by credible evidence presented by the Debtor based in part on actual bids and estimates. Mr. Hall also speculated that tenants in the future would move to the vicinity of other nearby retailers such as Wal–Mart, Office Depot, and Target but presented no factual details evidencing this trend. His tenant migration theory was rebutted by credible testimony from Mr. O'Boyle.

Because of the limited nature of his research since the date of his 1998 report, Mr. Hall was also unable to provide an opinion as to the current value of the Midland Plaza. Rather he testified that his original appraised value of $6.9 million should be reduced but did not have an opinion as to the amount of the reduction. The Court finds that Mr. Hall's discount and capitalization rates did not afford sufficient weight to the Debtor's sizeable historical cash flows and the generally good condition of the Midland Plaza. Unlike Mr. Lawrence's comparables, three of five of which were from the Knoxville area, Mr.Hall's comparables were from Durham, North Carolina, Macon, Georgia, Birmingham, Alabama, and Chattanooga, Tennessee. He did not personally visit any of the comparables but admitted that the two shopping center sales most nearly comparable to Midland Plaza were both sold by banks, which raises an inference that these may have been distressed sales of REO properties.

Based on the appraisal testimony, the Court finds the current market value of Midland Plaza to be $8.3 million, as testified to by Mr. Lawrence. Given the known claims in this bankruptcy case, the $5.4 million owed to Coolidge (stipulated to by the parties for purposes of the confirmation hearing), the $318,557.35 owed to general unsecured creditors, the $1.5 million general unsecured claim owed to the City, which as a non-interest bearing obligation and has a present value of approximately $712,000, the approximately $71,000 in secured priority real estate taxes owed to the City and County, and the estimated $245.000 in administrative claims, the Court finds that there is consideration equity in the Debtor's property, even without any attribution of value to the State Court Litigation.

## IV. *COOLIDGE'S OBJECTION TO CONFIRMATION*

Coolidge objected to confirmation of the Plan on the grounds that the Debtor's Plan: (1) is not feasible; (2) is not fair and equitable; (3) improperly "gerrymanders" similar claims into separate classes; (4) violates the absolute priority rule; (5) fails the best interests of creditors test; and (6) artificially impairs unsecured creditors. Each of these grounds is addressed below.

### A. *Feasibility Test Under § 1129(a)(11)*

Section 1129(a)(11) requires the Court to determine that confirmation of the plan of reorganization "is not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). The feasibility test requires only a showing that the plan offers a reasonable assurance of success, not a guarantee of success. *See In re Di*

*Maria,* 202 B.R. 634, 639 (Bankr.S.D.Fla. 1996) (Ray, J.); *see also In re Patrician St. Joseph Partners L.P.,* 169 B.R. 669, 674 (D.Ariz.1994) ("The mere potential for failure of the plan is insufficient to disprove feasibility."). In determining feasibility, the Court considered the testimony of Mr. O'Boyle, whose testimony the Court finds to have been credible.

### 1. Debtor's Historical Cash Flow

Historically, the Debtor has generated significant cash flow. The Debtor's Revised Cash Operating Statements (Debtor's Exhibit 21) show that for the years ending 1995 through 1999, the Debtor generated gross income of $1,485,000, $1,526,000, $1,484,000, $1,542,000, and $1,556,000, respectively. Annual net operating income ("NOI") was $913,000, $879,000, $1,092,000, $1,006,000, and $1,102,000, respectively, for the period.[5]

Mr. O'Boyle testified that since acquiring the Midland Plaza in 1988, the Debtor's cash flow was such that the Debtor had never missed a single debt service payment.

### 2. Debtor's Cash Flow During Bankruptcy

During the Chapter 11 case, the Debtor continued to generate substantial cash flow. On August 30, 1999, the Debtor's DIP report reflected a cash balance of $424,792. The November 30, 1999 report reflected a cash balance of $641,090. This is a $216,298 increase over three months and is net of monthly interest-only adequate protection payments to the mortgagee of $41,000. The Debtor's financial performance during this bankruptcy case further evidences its ability to fund its Plan.

### 3. Debtor's Pro Forma Ten–Year Forecast

In support of feasibility, the Debtor introduced into evidence a Pro Forma Ten–Year Forecast. The Court finds the principal assumptions underlying the Pro Forma Ten–Year Forecast reasonable. The foundation of the Pro Forma Ten–Year Forecast is the year 2000 projection prepared by Wood Properties. The Debtor utilized the year 2000 budget making certain revisions thereto and applying a modest 3% increase to certain revenue and expense items for the years 2001 through 2009. Mr. O'Boyle testified that he believed this 3% increase was consistent with recent increases in the Consumer Price Index ("CPI").

Certain expense items were eliminated. Prepetition, Commerce Group, a related entity, was budgeted to receive $50,000 per year as a management fee. Mr. O'Boyle testified that Commerce Group will not be paid this fee in the future. The Debtor also eliminated the budgeted $30,000 per year for the local leasing agent because Mr. O'Boyle intends to perform these (the management and leasing) duties without charge, relying on the profits from the Midland Plaza as compensation.

Considering the Debtor's historical cash flow, the Debtor's cash flow during the bankruptcy, and the testimony of Mr. O'Boyle, the Court finds the Debtor's Pro Forma Ten–Year Forecast and the underlying assumptions are reasonable and credible.

### 4. Necessary Capital Reserves & Debt Service Payments

The Debtor has the burden of showing that its future NOI is sufficient to cover debt service, necessary capital reserves, and leasing commissions. The Court finds that the Debtor has met this burden. Mr.

---

**5.** Although there were certain errors in the initial Cash Operating Statements offered by the Debtor (Debtor's Exhibit 15), the Court finds the errors were satisfactorily explained or otherwise immaterial and were, in any event, corrected in the revised Cash Operating Statements (Debtor's Exhibit 21). With these explanations and revisions, the Court finds the Debtor's revised Cash Operating Statements credible and reliable.

O'Boyle testified that the Debtor estimates capital reserves for year 2000 to be $475,000 because of the involuntary deferral of certain previously needed capital expenditures resulting from the dispute between the Debtor and First Union. The amount budgeted for capital expenditures is $250,000 each year thereafter, which is significantly more than has been historically expended by the Debtor. Although Coolidge raised the discrepancy between Mr. Lawrence's estimate and the Debtor's estimate of necessary capital improvements, the Court having considered Mr. O'Boyle's explanation of the nature of the differences, finds the Debtor's estimates of capital reserves credible and reasonable.

The Debtor's Pro Forma Ten–Year Forecast evidences the Debtor's ability to fund the necessary debt service payments under the Plan. In the year 2000, however, because of the $475,000 in capital reserves and bankruptcy distributions of $652,000, the Debtor projects a negative cash balance of $42,000. In the Plan, however, Mr. O'Boyle committed $250,000 for the purpose of insuring distributions to class 2 creditors should the Debtor's cash flow be insufficient to do so. At confirmation, Mr. O'Boyle further agreed to subordinate distributions otherwise due to him on his two allowed class 2 unsecured claims of approximately $29,000 and to CRO of approximately $176,000 to the distributions due to all classes of creditors under the Plan. Mr. O'Boyle's contingent guaranty and the subordinated amounts are more than sufficient to cover the minimal projected shortfall of $42,000.

After year-ending 2000, even assuming no increase in NOI, i.e., using year 2000 NOI of approximately $1,004,000, the Debtor, after funding of capital reserves of $250,000 and leasing commissions of $22,000, will have $732,000 available to fund debt service payments to Coolidge under the Plan. The Court finds the cash flow sufficient even if Coolidge's claim is ultimately allowed in the full filed amount of $5.6 million considering the appropriate

interest rates determined below. Therefore, the Court finds based on the credible evidence presented that the Debtor has shown an ability to fund the distributions due under the Plan.

Coolidge argued that the lease with Saks, Inc., formerly Proffitt's, which currently occupies approximately 44,000 square feet (or approximately 12% of the Midland Plaza), expires on December 31, 2000. Saks, however, recently accepted the Debtor's proposal to renew, which renewal includes an option to expand into Space "Q". Saks also has two five-year options to extend. Mr. O'Boyle testified that he reasonably believed Saks would exercise its option to expand into Space Q.

Mr. Hall's speculation that occupancy rates were going to decrease was simply contrary to the available evidence. The Debtor, through Mr. O'Boyle, presented credible, unrebutted evidence showing that a number of tenants had recently renewed or extended their leases, including Bristol, Bragg & Young, Baptist Hospital, Radio Shack, Revco Drugs/CVS,[6] and MDP, Inc. In addition, Mr. O'Boyle's unrebutted testimony indicated that other tenants had recently requested extensions or expansions, including Hancock Fabrics, Sherwin Williams, Fulton Credit Union, Mailboxes Et Cetera, Paula's Eyewear, Scrumptious, and Rainbow Rentals.

### 5. *Debtor's Ability to Make Five–Year Balloon Payment*

For purpose of feasibility, the Debtor needs to be able to fund the balloon payment in the future by refinancing or selling. *See In re Matter of Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1169 (5th Cir.1993). The court in *Briscoe* noted:

> It is reasonable to assume that the property itself will provide the source for the balloon payment. There is no evidence that the property will decline in value. Therefore, when the balloon is due, either the property will be sold, which will

6. This Lease was previously extended but not properly shown on the Rent Roll.

provide the balloon, or refinancing will be possible. Estimating property values fifteen years hence is inherently speculative, but the evidence presented to the bankruptcy court did not suggest that the property would decline in value so that the debtor would be unable to pay Heartland its remaining principal.

*Id.*

For purposes of this element, the Court finds that a five-year rather than a ten-year balloon is a more commercially reasonable term and therefore the appropriate term for the restructured mortgage loan based upon the evidence presented. Mr. Lawrence testified that the value of the property would increase between 2% and 3% per year. Both Mr. O'Boyle and Mr. Hall testified that the amortization of the loan would also reduce principal of the secured debt. Based upon the increase in value and decrease in principal, Mr. Wood testified that the Debtor would be able to refinance the property in five years.

Coolidge also relies on *In re Immenhausen Corp.*, 172 B.R. 343 (Bankr.M.D.Fla. 1994) as being factually similar to this case. The Court finds *Immenhausen* readily distinguishable. The *Immenhausen* debtor owned a 191,000 square foot shopping center that was worth less than the secured lender's claim. The *Immenhausen* debtor's operating history was spotty and heavily clouded. *See id.* at 348. The *Immenhausen* debtor's own pro forma cash flows, which incorrectly failed to include a proper allocation for capital reserves, showed that it could not fund its plan if the applicable market rate of interest exceeded 7.5%. *See id.* at 348–49. Because the bankruptcy court found that the applicable rate could not be less than 8.25%, the plan was not feasible on its face. *See id.* at 349.

In *Immenhausen*, the current real estate market was such that no lender would loan the debtor sufficient funds to refinance the property upon maturity of the five-year balloon under the Plan, particularly given the high risk of default and the debtor's cash flows. *See id.* Also, the debtor did not provide treatment in its plan of an $18.4 million unsecured claim that apparently did not receive adequate notice of an objection to its claim and thus would survive confirmation. *See id.*

The *Immenhausen* debtor had nothing to show but unwarranted optimism, given that the debtor's property was underwater, it had a proven inability to generate cash flow, and the real estate market conditions were unfavorable.

Unlike the *Immenhausen* debtor, the Debtor's cash flows—prepetition, during the case, and as reasonably projected—evidence its ability to fund the Plan and pay a market rate of interest on the Coolidge claim. The Debtor's undisputed historical ability to generate significant positive cash flow is one of several critical facts that distinguishes this case from *Immenhausen* and the other cases cited by Coolidge. The value of the Debtor's property substantially exceeds the aggregate amount of all claims. There are no unaccounted for claims. Coolidge presented no evidence, and the Court is aware of none, indicating that a downturn in market conditions is foreseeable. Therefore, considering all the evidence presented, the Court finds that the Plan is feasible.

### B. Fair and Equitable Under § 1129(b)

Because Coolidge, holder of the only claim in class 4, which is impaired under the Plan, voted to reject the Plan, the Debtor cannot satisfy the requirement of § 1129(a)(8), which provides, "[w]ith respect to each class of claims or interests— (A) such class has accepted the plan; or (B) such class is not impaired under the plan." As a result, the Debtor must seek to "cram down" the Plan over Coolidge's rejection under § 1129(b)(1) and (2), the "cram down" provisions of the Bankruptcy Code. Section 1129(b)(1) provides:

Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect

to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to a class of claims or interests that is impaired under, and has not accepted, the plan.

In turn, § 1129(b)(2) provides:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a *class of secured claims,* the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

(emphasis added).

Coolidge has not argued, and there is no evidence of, unfair discrimination. To be confirmed, however, the treatment of Coolidge's secured claim must be fair and equitable within the meaning of § 1129(b)(1) and (2).

■ The Plan seeks to allow Coolidge to retain its first priority lien on the property and assignment of rents and provide it with deferred cash payments with a present value equal to the full amount of its claim. The Debtor admitted prior to the confirmation hearing that as to the interest rate, based upon the opinion of Mr. Wood, current market conditions required that the interest rate of 7.5% in the Plan be increased and that the term be shortened from those included in the Plan.

### 1. *Appropriate Market Terms for Similar Commercial Loans*

The Debtor presented the testimony of Mr. Wood, an experienced, licensed commercial mortgage broker, regarding the market terms of a loan under these facts. The Court accepted Mr. Wood as an expert in the field of commercial mortgage lending. Having considered the demeanor, research, and methodology of Mr. Wood and the fact that he is engaged on a day-to-day basis in the commercial real estate mortgage loan market, including the market for loans of this type, the Court finds his testimony to be credible.

For its part, Coolidge did not present an expert on commercial real estate loans and provided no testimony regarding an appropriate interest rate.

In developing his opinion, Mr. Wood considered the appearance of the property, the historical and projected cash flows of the Midland Plaza, the vacancy rate, the borrowers, the property's up-side potential, and the appraised value of $8.3 million determined by Mr. Lawrence. Mr. Wood's research indicated the Midland Plaza was generally in very good condition. One source cited by Mr. Wood stated, "You could eat off the parking lot, it's so clean." He reviewed the Debtor's NOI for the 1995–1999 period and the Debtor's Pro Forma Ten–Year Forecast. In Mr. Wood's opinion, the single most important factor in considering what terms are available to a borrower is cash flow because cash flow services the debt and funds capital improvements.

Mr. Wood's analysis took into consideration the second mortgage to be placed on the Midland Plaza in favor of the City and the non-recourse nature of the proposed loan. Mr. Wood testified that while some lenders consider a second mortgage in determining the loan to value ratio, others do not. Further, he stated that if a lender were to consider the second mortgage, the present value of the second mortgage of approximately $750,000, not the face value of $1.5 million, would be the relevant amount. Mr. Wood also considered the vacancy rate at the Midland Plaza. He testified that currently there is an extremely strong market for commercial real estate loans and that the property could support a loan under the circumstances.

Although some lenders would go as high as a 90% loan to value ratio, Mr. Wood considered a more conservative 75% loan to value to be more appropriate.

### a. *Appropriate Interest Rate*

■ The Eleventh Circuit holds that the current market rate of interest shall be determined by the "coerced loan" approach. *See United States v. Southern States Motor Inns, Inc. (In Matter of Southern States Motor Inns, Inc.)*, 709 F.2d 647, 652–53 (11th Cir.1983), *cert. denied* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984) (determining the appropriate interest rate for deferred payments of delinquent federal taxes under § 1129(a)(9)(C) in the context of a Chapter 11 reorganization case). Under the "coerced loan" approach, the court must look to interest rates charged by the creditor making a loan to a third party with similar terms, duration, collateral, and risk. *See id.; see also In re Felipe*, 229 B.R. 489, 492 (Bankr.S.D.Fla.1998) (applying "coerced loan" approach to determination of the appropriate interest rate for deferred payment of secured claim under § 1325(a)(5)(B)(ii)). The Court holds the "coerced loan" approach equally appropriate in the context of a "cram down" of a secured creditor's claim under § 1129(b)(2)(A)(i).

Mr. Wood testified both a floating interest rate loan and a fixed rate loan were available under the circumstances. The floating interest rate would range from LIBOR (the London Inter Bank Offered Rate) plus 250 to 375 basis points (one hundred basis points equals one percent). In his opinion, 325 basis points over 30–day LIBOR or 90–day LIBOR was reasonable and obtainable. Mr. Wood testified that the 30–day LIBOR was at about 5.80% and the 90–day LIBOR, another alternative, was at about 6.04%.

A fixed rate loan would be available at a higher rate. The fixed rate loan would have an interest rate of 350 to 400 basis points over the comparable five-year U.S. Treasury Note. He estimated that the current five-year Treasury Note rate was 6.60%.

Mr. Wood testified that although the existence of the State Court Litigation may require some explanation because of the Debtor's cash flow, a loan would be possible with adequate explanation provided to the lender. He furthered testified that the benefit of the State Court Litigation would be that if successful, the Debtor will be able to reduce the principal outstanding on the loan. The Court finds, therefore, that the adverse consequences of the State Court Litigation, if any, would be minimal and therefore does not consider the existence of the State Court Litigation to be a major factor in determining an appropriate market rate of interest.

Weighing all of the evidence presented, the Court finds that either a floating interest rate of 325 basis points over the 90–day LIBOR or a fixed rate of 4% over the five-year Treasury Note would be appropriate. The Court will allow the Debtor to decide whether to accept the fixed rate or floating rate. The interest rate selected shall be effective from January 20, 2000, the date of the Court's oral ruling on this matter.

### b. *Appropriate Term*

In Mr. Wood's opinion, two mortgage terms would be available. The first option

would be for seven years, including (1) a two-year interest only loan and (2) a five-year amortizing term thereafter (the "Seven–Year Option"). The second option would be an amortizing five-year term (the "Five–Year Option"). Both terms are clearly within the range held acceptable by other courts for commercial real estate loans. *See In re Briscoe Enters., Ltd.*, II, 994 F.2d 1160, 1169 (5th Cir.1993) (finding fifteen-year balloon payment fair and equitable); *see also In the Matter of James Wilson Assocs.*, 965 F.2d 160, 172–73 (7th Cir.1992) (affirming bankruptcy court's order approving nine-year extension); *In re Patrician St. Joseph Partners L.P.*, 169 B.R. 669, 681 (D.Ariz.1994) (affirming bankruptcy court's order extending fully matured mortgage over a ten-year term); *In re Di Maria*, 202 B.R. 634, 640 (Bankr. S.D.Fla.1996) (finding that "a ten year payout to the IRS [on its secured claim] is not excessive or unreasonable when the collateral is real estate and the secured creditor is receiving interest to compensate it for the opportunity cost of money and risk of default"). Weighing all the evidence presented, the Court finds that a five-year term is appropriate.

### c. *Appropriate Amortization Period*

In Mr. Wood's opinion, the appropriate amortization period would be twenty-five to thirty years. A twenty-five year amortization period is within the range approved by Courts for commercial real estate loans. *See Briscoe*, 994 F.2d at 1169 (finding thirty-year amortization fair and equitable); *see also James Wilson*, 965 F.2d at 172 (affirming bankruptcy court's order approving twenty-five-year amortization); *Patrician St. Joseph*, 169 B.R. at 681 (affirming bankruptcy court's order confirming plan with twenty-five-year amortization). Considering the evidence, the Court finds that a twenty-five-year amortization period for purposes of this restructured real estate mortgage loan is appropriate.

### 2. *Unfair "Shifting of the Risk"*

Coolidge's argument, based on the language of *Miami Center* that the Plan im-properly "shifts" the risk from the Debtor to the secured creditor, ignores the fact that it is fully secured. *See In re Miami Center Assocs. Ltd.*, 144 B.R. 937 (Bankr. S.D.Fla.1992). The Court in *Miami Center* was faced with a situation markedly different from the one here:

> According to the debtor's own projections, the debtor will be required to pay approximately half of Aetna's total secured claim as a balloon payment ten years in the future. Given the risks associated with hotel loans in general as was testified to by both experts and the fact that the expected increase in value in the hotel will be contingent upon the completion of a substantial renovation project, it is questionable whether Aetna will receive the value of its total secured claim. It is just this sort of attempted risk shifting that the absolute priority rule was intended to prevent.

*Id.* at 942.

The court therefore found the two risks—an unfavorable market for hotel loans and increase in value contingent on substantial renovations—could not fairly be placed on the back of the secured lender. In *In re Lakeside Global II, Ltd.*, 116 B.R. 499 (Bankr.S.D.Tex.1989), cited by the Court in *Miami Center*, is also distinguishable. The *Lakeside* Court found that the terms of the proposed loan were unacceptable. *See id.* at 514 stating that:

> Given the economic climate of the city, a risk exists that the property will not generate income as projected or that the property will be worth less upon maturity than its present value. If a new lender were to lend on these projects, the court is satisfied that it would not lend on the interim payment, interest rate structure, and balloon terms contemplated by this plan.

In the other case cited by Coolidge, *In re Monarch Beach Venture, Ltd.*, 166 B.R. 428, 430 (C.D.Cal.1993), as in *Miami Center*, the court found that there was an unacceptable risk on the lender in that the Debtor's plan was contingent on the Debt-

or's successfully converting rental apartments to condominium units.

Here, Coolidge, a fully secured creditor with an approximate $3.0 million equity cushion above its $5.4 million first mortgage debt (stipulated to by the parties for purposes of the confirmation hearing only), is hardly exposed to unacceptable risk. On one hand, if the Debtor fails to make the payments under the Plan, then Coolidge will be able to foreclose on the property. On the other hand, if the Debtor does make the payments under the Plan, then Coolidge will have earned a market rate of interest throughout the term of the loan. The cases relied on by Coolidge all involved properties having no equity cushion, which in fact does "shift" the entire risk of loss to the lender for the benefit of equity. Such, however, is not the case here.

Coolidge also cites *In re Immenhausen Corp.*, 172 B.R. 343 (Bankr.M.D.Fla.1994), in which the debtor proposed a plan under which the "remaining cash flow would only be sufficient to make interest only payments to the Bank at 3.32% with no amortization of principal." *Id.* at 348. Here, the Debtor is proposing to pay Coolidge a market rate of interest, not a negative amortization. The treatment afforded Coolidge here is more conservative than the treatment afforded Mutual Life Insurance Company of New York ("MONY") in *Patrician St. Joseph*, wherein the Court confirmed a plan that imposed a ten-year repayment term and an 8% interest rate based upon a twenty-five-year amortization. *See In re Patrician St. Joseph Partners, L.P.*, 169 B.R. 669, 681 (D.Ariz.1994).

Because of the substantial equity cushion, the excellent real estate market for shopping centers, and the Debtor's proven ability to generate substantial cash flows, the Court finds the risk imposed on Coolidge under the Plan to be acceptable and in no way unfair or inequitable. Further, the interest rates the Court found to be acceptable take into consideration the risks associated with this loan. Therefore, Coolidge is adequately compensated for the level of risk involved, satisfying the requirements of § 1129(b).

### 3. *Indubitable Equivalent Under 1129(b)(2)(A)(iii)*

Coolidge argues that it is not receiving the "indubitable equivalent" of its claim. In a technical sense, Coolidge may be right—the Plan does not propose to provide it with the "indubitable equivalent" under clause (iii) of subparagraph (A) of § 1129(b)(2). Similarly, the Plan does not propose to provide the protections of clause (ii) of subparagraph (A) (liens to attach to proceeds if the plan contemplates a sale of property subject to the liens).

■■■ Rather, the Debtor seeks confirmation under clause (i) of subparagraph (A). A debtor only needs to satisfy one of the three standards set forth in paragraph § 1129(b)(2)(A). *See In the Matter of Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1168 (5th Cir.1993) stating that:

> While this Court has held that simple technical compliance with one of the three options in 1129(b)(2)(A) may not necessarily satisfy the fair and equitable requirement, it has not transformed the "or" in 1129(b)(2)(A) into an "and." As we hold that the plan satisfies 1129(b)(2)(A)(i), we need not attempt to decipher the meaning of "indubitable equivalent." (internal citations omitted).

The "indubitable equitable" requirement and case law decided thereunder are not applicable here. Even if the "indubitable equivalent" requirement were applicable, by retaining its lien and receiving deferred cash payments with a present value equal to the full amount of its claim, the Court finds that Coolidge is receiving the "indubitable equivalent" of its claim.

### 4. *Matured Mortgage May Be Extended Under § 1129(b)(2)(A).*

■■■ The argument that a fully matured note (the Debtor disputes that the note is fully matured in the State Court Litigation) cannot be extended is contrary to the language of § 1129(b)(2)(A), which

contains no such limitation, and case law decided thereunder. *See In re Patrician St. Joseph Partners, L.P.*, 169 B.R. 669, 681 (D.Ariz.1994) (allowing mortgage fully matured on July 1, 1992, over two months before the Debtor's filing on August 4, 1992, to be extended over a ten-year term); *see also In the Matter of Naugle's Nursery, Inc.*, 37 B.R. 574 (Bankr.S.D.Fla.1984) (confirming plan that stretched three, five and seven-year notes to fourteen years).

### 5. *Restructured Loan Documents*

Mr. O'Boyle testified that the prepetition restrictions on the Debtor's ability to fund capital improvements hampered its operations. For example, Mr. O'Boyle testified that First Union refused to allow the Debtor to use funds to repair roofs or to perform environmental remediation of Space Q. Mr. O'Boyle also testified that First Union's right to approve the Debtor's new leases also reduced the Debtor's operating revenues. For example, Mr. O'Boyle testified that the Hancock Fabric lease negotiations were held up because First Union refused to sign a subordination and non-disturbance agreement.

Mr. O'Boyle testified that were the overly-restrictive terms of the loan to remain in place, it was his belief that Coolidge would try to obtain the Midland Plaza through foreclosure by inducing a non-monetary default so as to invoke the twenty-one day non-judicial foreclosure process in Tennessee, thereby frustrating the ability of the Debtor to reorganize successfully under its confirmed Plan. Continuing the restrictive cash controls might impair the Debtor's ability to consummate the Plan in that Coolidge could impede the Debtor's efforts to increase rental revenues through aggressive leasing and capital improvements.

■■■ Based upon the unrebutted testimony of Mr. O'Boyle, the Court finds that certain of the terms and conditions of the Fourth Loan Modification, particularly the cash controls and necessary approvals re-

quired from Coolidge, are unnecessary and will impair the ability of the Debtor to reorganize.[7] The Court finds further that given the substantial equity cushion in the property, the modification of the terms and conditions of the loan documents will not unduly harm Coolidge. The Court holds, therefore, that the loan documents may be modified as reasonably necessary to conform to loan documents customarily used in the commercial real estate mortgage market in the State of Tennessee. The Court will reserve jurisdiction to hear and determine any disputes between the Debtor and Coolidge with respect to the terms and conditions of the restructured and modified loan documents.

### C. *Gerrymandering of Creditor Classes*

#### 1. *Because Both Classes Accepted, Issue Is Moot*

The Court holds that because the City, like the general trade creditors, voted in favor of the Plan, the issue of gerrymandering is moot, i.e., if the classes were combined, the Debtor would still have an impaired accepting class, and only one such class is necessary under § 1129(a)(10).

#### 2. *Coolidge Does Not Have Standing*

■■■ Each case cited by Coolidge involves the improper classification of a secured lender's deficiency claim to avoid having the deficiency claim block the acceptance of the impaired class of general unsecured creditors. Here, however, Coolidge is attempting to assert the right to object to classification of the claim of the City, which it does not hold. Coolidge does not have standing to do so. As noted above, the City, which has not objected to classification of its claim, has voted to accept the Plan.

---

7. In making this ruling, the Court is not determining that such terms and conditions

were unreasonable or unnecessary prepetition.

### 3. Debtor's Legitimate Business Justifications for Separate Classification

The general rule is that "thou shall not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *In the Matter of Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1167 (5th Cir.1993) (citing to *Matter of Greystone,* 948 F.2d 134, 139 (5th Cir.1991)). There may be, however, good business reasons to support separate classification. *See id.* The determination of "whether there were any good business reasons to support the debtor's separate classification is a question of fact." *Id.* (citing *Greystone,* 948 F.2d at 141 n. 7). Following *Greystone,* the Fifth Circuit in *Briscoe* held that the City of Ft. Worth had sufficient non-creditor interest to justify separate classification by the Debtor. The Fifth Circuit stated:

> The city of Fort Worth is distinct from other creditors including Heartland. Not only does it have non-creditor interests relating to its urban housing program, but it contributes $ 20,000 a month in rental assistance. Heartland argues that the plan is not feasible because there is no assurance of continued rental assistance from the city. This argument suggests that the relationship with the city is essential to the continued operation of this housing complex. Its continuing contributions and interests make it distinct from Heartland and the trade creditors. We emphasize the narrowness of this holding. In many bankruptcies, the proffered reasons as in *Greystone* will be insufficient to warrant separate classification. Here it seems justified. Moreover, as Heartland nominates one of the three trustees, it has means for protecting its interests. Therefore, we hold that the bankruptcy court was not clearly erroneous in separately classifying the city's unsecured claim.

*Id.*

Here, the Debtor was aware that the City would be interested in a second mortgage under the Plan. The Debtor therefore knew that separate classification would allow it to avoid having to pay one-half of the City's $1.5 million claim in cash on the effective date (which might have made the plan unfeasible), if the City would accept a second mortgage. The City has a direct interest in the profitability of the Debtor because of its status as a taxing authority, as well as a direct interest in preserving the property for the benefit of the local citizens. The City will receive less favorable treatment under the Plan than unsecured creditors and still voted to accept the Plan. The Debtor, the City, and First Union, Coolidge's predecessor in interest, contemplated granting the City a second mortgage on the property upon the satisfaction of certain conditions specified in the Fourth Loan Modification Agreement. These factors, when combined, provide a good business reason and justify separate classification of the City's claim.

### D. *The Absolute Priority Rule*

The absolute priority rule is set forth in § 1129(b)(2)(B) and provides, *with respect to a class of unsecured claims,* that:

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

Coolidge asserts that because the general partners retain their interests under the Plan, the Plan violates the absolute priority rule.

As a fully secured creditor, Coolidge does not have standing to assert the absolute priority rule of § 1129(b)(2)(B)(ii). *See Corestates Bank, N.A. v. United Chemical Tech., Inc.,* 202 B.R. 33, 54–55

(E.D.Pa.1996) (refusing to extend the absolute priority rule to fully secured creditors as an implicit requirement to confirmation under § 1129(b)); *see also In re Patrician St. Joseph Partners, L.P.,* 169 B.R. 669, 682 (D.Ariz.1994); *In re Paradise Springs Assocs.,* 165 B.R. 913, 920–21 (Bankr. D.Ariz.1993); *In re United Marine, Inc.,* 197 B.R. 942 (Bankr.S.D.Fla.1996) (finding that a dissenting unsecured creditor in an accepting class cannot assert the absolute priority rule).

■■■ This Court respectfully disagrees with courts that have expanded the definition of "fair and equitable" under § 1129(b)(1) to rewrite the clear, unambiguous, and express requirements of § 1129(b)(2). *See In re Miami Center Assocs., Ltd.,* 144 B.R. 937 (Bankr.S.D.Fla. 1992) (citing *In re Lakeside Global II, Ltd.,* 116 B.R. 499 (Bankr.S.D.Tx.1989)). As stated in *Miami Center,* "[t]he absolute priority requirement is implicit in § 1129(b)(1) and (2). . . ." *Miami Center,* 144 B.R. at 941. This statement is incorrect in that the absolute priority rule is *explicit,* not *implicit,* in § 1129(b)(2). Just as Congress expressly incorporated the absolute priority rule in paragraphs (B) and (C) of § 1129(b)(2), it just as expressly excluded it from paragraph (A) of § 1129(b)(2). It is a basic principle of statutory construction that " '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Bates v. United States,* 522 U.S. 23, 118 S.Ct. 285, 290, 139 L.Ed.2d 215 (1997) (citing *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972))). Some of the courts undertake an extensive analysis of the legislative history of § 1129(b), which appears inappropriate given that the language of § 1129(b) is by no measure ambiguous.

Congress was obviously aware of the absolute priority rule, as it included the rule in paragraphs (B) (relating to classes of unsecured creditors) and (C) (relating to classes of interest), yet it excluded it from paragraph (A) (relating to classes of secured claims) of the same provision. This Court may agree that the "fair and equitable" standard of § 1129(b)(1) may require the Court to consider "implicit" factors other than those expressly set forth in paragraphs (A), (B), and (C) of § 1129(b)(2). *See In the Matter of Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1168 n. 44 (5th Cir.1993) citing *Matter of D & F Constr., Inc.,* 865 F.2d 673, 675–76 (5th Cir.1989) and stating:

In that case, the plan's negative amortization required the secured creditor to contribute additional money to the plan for twelve years before principal would be repaid. The creditor's ability to foreclose during this period was also impaired. This Court assumed for purposes of the case that the requirements of 1129(b)(2)(A) had been "literally met."

■■■ Although not determinative, one "implicit" factor the Court considered in determining what is fair and equitable was the fact that Coolidge—unlike most creditors who involuntarily become ensnared in a reorganization case—bought its loan after the Debtor filed bankruptcy. It did so with the Plan, including the treatment of its purchased claim, on file with the Court. As to unfair risk, Coolidge performed, or certainly should have performed, sufficient due diligence with respect to the risks incident to stepping in First Union's shoes. The assessed risks should and could have been factored into the purchase price paid by Coolidge. Coolidge cannot fairly say that it is not getting precisely the benefits of its bargain. This Court is of the opinion that receiving the benefits of one's bargain is indisputably fair and equitable treatment under a plan of reorganization.

■■■ But this Court is not, through an over-expansive reading of the "fair and equitable" standard, going to rewrite paragraph (A) of § 1129(b)(2) to include a rule

purposefully excluded by Congress. Rewriting the statute also visits harm on the very unsecured creditors and interest holders it was expressly designed to protect. Allowing a secured creditor to block confirmation under the absolute priority rule eviscerates the votes of classes of unsecured creditors, at least one of which would have had to vote to accept the plan under § 1129(a)(10). The Court holds therefore as a matter of law that a fully secured creditor, whose treatment under a plan is fair and equitable and not unfairly discriminated against, does not have standing to assert the absolute priority rule to block confirmation of an otherwise confirmable plan and by so doing unfairly disenfranchising other impaired classes, which have voted to accept the Plan.

The recent Supreme Court case, *Bank of America National Trust & Savings Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999), upon which Coolidge relies, is distinguishable. The *LaSalle* debtor sought to confirm a plan over the objection of an undersecured lender, which held a $38.5 million deficiency claim. *See id.* at 1415. *LaSalle* is limited to the situation where the absolute priority rule of § 1129(b)(2)(B)(ii) both applies and is violated. *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 106–07 (Bankr.D.Del.1999). Here, all impaired unsecured creditors' classes with standing to assert the rule have voted to accept the Plan; therefore, the absolute priority rule under 11 U.S.C. § 1129(b)(2)(B)(ii) and cases decided under the rule, including *LaSalle,* do not apply.

### E. *Best Interests of Creditors*

■■■ Section 1129(a)(7) provides that:

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; . . . .

Coolidge as a fully secured creditor does not have standing to assert the best interest of creditors test under § 1129(a)(7). *See In re Computer Optics, Inc.,* 126 B.R. 664, 666 (Bankr.D.N.H.1991) ("[T]he Bank as an oversecured creditor does not have standing to raise the 'best interests of creditors' requirement under § 1129(a)(7) . . ."). The Court, however, has an independent duty to determine whether a Plan complies with the best interests of creditors.

■■■ By Order dated November 22, 1999, Coolidge has already been granted relief from stay effective January 15, 2000, absent plan confirmation, to conduct a non-judicial foreclosure sale of the Midland Plaza. Under Tennessee law, after a twenty-one-day notice, a mortgagee can take title to the property. Under these circumstances, both Mr. O'Boyle and Mr. Lawrence testified that at a foreclosure sale, no potential buyer would have an opportunity to conduct adequate due diligence and satisfy financing contingencies on a property of this size. Both Mr. O'Boyle and Mr. Lawrence testified that a property of this type would require substantial time to close. Unsecured claims, including that of the City, would not receive a distribution in a Chapter 7 liquidation. Coolidge has admitted this in its proposed disclosure statement, stating,

Here if the [*Coolidge*] Plan is not confirmed, then holders of unsecured claims will not receive a distribution as Coolidge will have the right to seek relief from stay and take title to Midland Plaza via a non-judicial foreclosure. In the environment of a non-judicial foreclosure, Coolidge likely would take title to the Midland Plaza and there would be nothing left for the unsecured creditors.

Article VI, Coolidge's Disclosure Statement (proposed), Exhibit A to Coolidge

Amended Motion to Reconsider Order Denying First Union's Motion to Terminate Exclusivity, dated December 22, 1999.

Coolidge's alternative assertion, that the Court could allow a trustee to attempt to conduct a § 363 sale of the Midland Plaza and use the proceeds to pay unsecured creditors, ignores certain obvious facts. First, Coolidge has by previous Order been granted relief from stay, conditioned only upon the Debtor's failure to achieve timely confirmation of its Plan. Absent restructuring of its loan under a confirmed plan of reorganization, the Court does not believe there are grounds to reimpose the stay. Second, Coolidge could object to a Chapter 7 trustee's use of cash collateral necessary to fund a § 363 sale. Finally, there is no evidence that the Trustee, under what would surely be expedited circumstances, could net sufficient funds to pay all unsecured creditors in full, including the $1.5 million claim of the City. Therefore, the Court finds that the evidence shows that creditors will receive under the Debtor's Plan at least what they would receive if the Debtor were liquidated under Chapter 7.

## F. *Artificial Impairment*

Section 1129(a)(10) provides that "[i]f a class of claims is impaired under a plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."

 Section 1124 provides that a class of claims or interests is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." In the 1994 amendments to the Bankruptcy Code, Congress deleted subsection (3) from § 1124, which had provided that payment in full without interest of the allowed amount of the claim left the claim unimpaired. *See In re Crosscreek Apartments, Ltd.,* 213 B.R. 521 (Bankr.E.D.Tenn.1997) stating that:

The courts which have considered the current version of § 1124 ... have concluded that the deletion of subsection (3) from § 1124 means that there is no longer an exception to the general rule that all classes are deemed impaired for claims paid in full upon the effective date of the plan or, in other words, a class of creditors which will receive payment in full upon the effective date of the plan is now impaired within the meaning of the Bankruptcy Code;

*see also PNC Bank, N.A. v. Park Forest Dev. Corp. (In re Park Forest Dev. Corp.),* 197 B.R. 388 (Bankr.N.D.Ga.1996); *In re Atlanta–Stewart Partners,* 193 B.R. 79, 82 (Bankr.N.D.Ga.1996). Thus, under § 1124 as amended, if a class of claims is not paid in full with interest on the effective date, the class is impaired.

 Class 2 is impaired under the Plan because the allowed claims are paid over time, albeit a short period, through June 30, 2000, and without interest. Coolidge argues that the Debtor has sufficient cash on hand to pay the holders of class 2 claims in full with interest on the effective date, and the treatment provided is solely to impair class 2 artificially to satisfy the requirement of § 1129(a)(10).

This argument fails for several reasons. First, Coolidge overlooks the allowed claim of the City in the amount of $1.5 million, which is the only claim in class 3, is impaired under the Plan, and has voted to accept the Plan. The Debtor has approximately $546,469.76 on hand to fund the Plan. Therefore, the Debtor cannot pay the claim of the City in full with interest on the effective date.

Even assuming there were no City claim, the evidence presented shows the Debtor does not have sufficient funds to pay class 2 in full with interest on the effective date. The estimated administrative claims are approximately $245,000, and the secured tax claims are $71,000. Capital improvements in the amount of $475,000 need to be funded immediately. Excluding the $475,000 entirely, given the $546,469.76 in available cash, there are not sufficient funds to pay class 2 of approxi-

mately $318,000 in full with interest without Mr. O'Boyle's and CRO's agreement to subordinate their claims. More importantly, Mr. O'Boyle testified that the Debtor needs to earmark the $475,000 for immediate and necessary capital improvements (an amount Coolidge has argued is not sufficient). The Court finds that under the facts presented, the Debtor's treatment of class 2 was proper and was not intended to impair class 2 artificially.

## V. CONCLUSIONS OF LAW

Based upon the foregoing discussion and analysis, the Court makes the following conclusions of law:

1. The Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core matter pursuant to 11 U.S.C. § 157(b)(2)(L). Venue is proper in this district pursuant to 28 U.S.C. § 1408;

2. The Debtor's Plan of Reorganization satisfies the requirements of 11 U.S.C. § 1129(a)(1)–(13), except for 11 U.S.C. § 1129(a)(8);

3. Notwithstanding the requirements of 11 U.S.C. § 1129(a)(8), the Court may confirm the Plan if the Plan does not discriminate unfairly and is fair and equitable with respect to each class that is impaired under the Plan and has not accepted the plan, pursuant to 11 U.S.C. § 1129(b)(1) & (2), the "cram down" requirements. The Debtor's Plan of Reorganization satisfies 11 U.S.C. § 1129(b)(1) & (2) with respect to the fully secured claim of Coolidge;

4. The Plan has been accepted by at least two classes of impaired claims, classes 2 and 3;

5. With respect to each impaired class of claims or interests, each holder of a claim or interest has accepted the Plan or will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date, pursuant to 11 U.S.C. § 1129(7)(A);

6. The Plan complies with the applicable provisions of Title 11;

7. The Debtor has complied with the applicable provisions of Title 11;

8. The Court finds that the Debtor filed the bankruptcy in an attempt to restructure its mortgage and other debts and concludes that the Plan has been proposed in good faith and not by any means forbidden by law;

9. All payments made or promised by the Debtor under the Plan or by any other person for services or for costs and expenses in, or in connection with, the Plan and incident to the case have been fully disclosed to the Court and are reasonable or, if to be fixed after confirmation of the Plan, will be subject to approval of the Court;

10. The identity, qualifications, and affiliations of the persons who are to be directors or officers, if any, of the Debtor, after confirmation of the Plan, have been fully disclosed, and the appointment of such persons to such offices, or their continuance therein, is equitable and consistent with the interests of the creditors and equity security holders and with public policy;

11. The identity of any insider that will be employed or retained by the Debtor and compensation to such insider has been fully disclosed;

12. The confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor;

13. The Court shall retain jurisdiction as provided in the Plan;

14. The Court will enter a separate Order confirming the Plan and overruling the Coolidge Objection, subject to the following modifications to the Plan:

a. The proposed interest rate and payment term shall be modified consistent with this opinion;

b. Mr. O'Boyle shall execute a written guaranty containing his obligation to

pay in full, to the extent necessary if the Debtor's cash flows are insufficient, the distribution due under the Plan to holders of class 2 claims;

c. Mr. O'Boyle and CRO shall execute a written subordination agreement, subordinating their rights to receive distributions under the Plan as holders of allowed class 2 claims, to the rights of holders of classes' 2, 3, and 4 claims under the Plan to receive distributions under the Plan; and

d. The proposed restructured loan documents, as revised to reflect the Court's oral ruling of January 20, 2000, shall be agreed to by the Debtor and Coolidge or approved by further Order of the Court after notice and a hearing; and

15. The Court finds the modifications of the Plan do not adversely affect creditors. Rather, the modifications with respect to the treatment of Coolidge are beneficial, and the Court concludes that the requirements of 11 U.S.C. § 1127(a) are satisfied.