## In re IMMENHAUSEN CORPORATION, Debtor.

**Bankruptcy No. 92–8656–8P1.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

July 5, 1994.

See also, 166 B.R. 449.

Charles Tatelbaum, Clearwater, FL, Elihu Fier, New York City, for debtor.

John J. Lamoureux, Tampa, FL, for BHF.

## ORDER ON OBJECTION TO CONFIRMATION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a yet to be confirmed Chapter 11 case of Immenhausen Corporation (Debtor) and the matter under consideration is an Objection to Confirmation of the Plan filed by the Debtor, by Berliner Handels-und Frankfurter Bank (Bank), and the Debtor's attempt to resort to § 1129(b) cram-down provision of the Bankruptcy Code in order to overcome the rejection by the Bank of the Debtor's Plan of Reorganization.

### Historical Background of the Debtor

The Debtor is the owner of a 191,000 square foot shopping mall known as North-dale Court Shopping Center constructed ten years ago. The Shopping Center which oc-

cupies approximately 23 acres of land, is located on a main thoroughfare in Tampa, Florida.

The Debtor is a Netherlands Antilles corporation formed in 1979 but domesticated in the United States in December, 1989. The ownership structure of the Debtor is somewhat shrouded in mystery and it is difficult to discern from this record who are really the controlling principals of the Debtor. It appears that at the time relevant Mr. Jim Binch was the President who was never really involved in the affairs of the Debtor. Gisela H. Laubitz (Ms. Laubitz) was Vice President and she is still acting as such and one Jeffrey Levine, an attorney, the Assistant Secretary whose sole function appears to be keeping the corporate minutes of the Debtor and filing the required annual reports.

The record reveals that all outstanding shares of this Debtor are held by Century Holding, a British Virgin Island entity which is either a corporation or a limited partnership, in which apparently one Mr. Wolfgang Stolzenberg (Stolzenberg), resident of Montreal, Canada, and Mr. Edwin Baenziger who is either a resident of Liechtenstein or Switzerland, are the principals. Ms. Laubitz, who is supposed to be the only person in charge of overseeing the operation of the one and only asset of the Debtor, the shopping center, is a resident of Toronto, Canada. She operates a consulting business involving finance, real estate management and development under the trade name of G.L. Management Services.

The Debtor has no employees and the shopping center is operated by Pappas Management, a local real estate firm who was apparently hired by Ms. Laubitz.

In 1986 the Bank granted a short term bridge loan in the amount of $16,500,000.00 to the Debtor to assist the Debtor to obtain a long term permanent financing from another source. This loan was guaranteed by First Holdings Corporation (First Holdings), a Panamanian corporation which is now defunct.

The Debtor was unsuccessful to obtain permanent financing and Mr. Stolzenberg negotiated with the Bank in order to obtain several loan modifications. Mr. Stolzenberg was successful in his negotiations with the Bank and the Bank agreed to extend the maturity date of the original loan for additional periods from time to time, but the extensions granted never exceeded one year. As a condition for the loan extensions, the Debtor agreed to make principal reduction payments. Between 1986 and 1992, the Debtor did in fact reduce the outstanding principal balance from $16,500,000.00 to $11,000,000.00.

It appears that none of these payments were made from any operating surplus of the Debtor since the Debtor had none and, on the contrary, were obtained from several third party sources. For instance, when Ms. Laubitz needed funds to meet this obligation and to meet the operating expenses of the Debtor she contacted C.H. International Overseas Limited (C.H. International), a Cyprus corporation which is also in liquidation. Mr. Stolzenberg was the Chairman of the parent company of C.H. International, known as Castor Holdings, and Mr. Baenziger was the other principal in Castor Holdings. Mr. Kyriallis, who was with C.H. International was apparently an agent for an entity known as Global Management, a Liechtenstein corporation, and funds requested were furnished from time to time possible by Global Management, although it is not clear which of the several entities wired the funds requested. The funds were forwarded if it was needed to service the Debt owed to the Bank to New York and if it was to meet operating deficits they were wired to the bank account maintained by the Debtor in Tampa. These advances obtained by the Debtor were evidenced by notes executed by the Debtor which were later purchased by European Overseas Bank, (EOB) located in Piscadera-bay, Curacao, Netherlands Antilles.

### Procedural History of this Chapter 11 Case

On June 26, 1992, the Debtor filed his voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code. At the time the Petition was filed there was already a foreclosure action pending in Hillsborough County Circuit Court filed by the Bank. In its

Schedules, the Debtor originally scheduled EOB as holding a fixed, liquidated claim in the amount of $18,451,386.20 ostensibly representing the advances obtained by the Debtor through Mr. Kyriallis either from Mr. Stolzenberg or Mr. Baenziger or some of the entities controlled by them. The claim was filed as an unsecured claim. It is interesting to note that EOB's address stated on the Schedule, filed by the Debtor was the address of Blum & Henning, a New York law firm, rather than the address of EOB, which is apparently still not known to anyone. So far there was no challenge to this claim by the Debtor. Nevertheless, for whatever reason, EOB is not included in any class of creditors in the Plan of Reorganization filed by the Debtor. Later on, the Debtor amended the Schedules and scheduled the debt owed to EOB as disputed. Ms. Laubitz was unable to explain the reason for the change, she merely stated that the claim was challenged for the sole reason that she made several attempts to communicate with EOB without success.

At the commencement of this Chapter 11 case the Debtor was indebted to the Bank on the mortgage note in the amount of $11,000,000.00 in principal and $371,881.71 in accrued interest, plus expenses, attorneys fees, and costs. The Bank perfected its first mortgage on the shopping center and a security interest in all the personal property owned by the Debtor including the rents generated by the shopping center. On the Petition date, the Debtor had a cash reserve of $167,186.67 and the shopping center was 16% vacant.

Since the commencement of the case the Debtor substantially reduced the vacancy rate from 16% to 8.6% by the end of February, 1994. In this connection, it should be pointed out that the management company offered substantial rent concessions and tenant improvement incentives to new tenants. For instance, the bulk of the tenant improvement funds were spent outfitting 14,800 square feet of space for two tenants, Kid's Play, Inc. and Southern Restaurant Management, d/b/a Kenny Rogers' Rotisserie Chicken. The cost of these tenant improvements averaged $9.66 per square foot. In addition, the Debtor also offered as many as ten

months of free rent to new tenants. The rent concessions granted to Kenny Rogers totaled $32,687.50 which reduced the effective rent from $10.00 per square foot to $6.25 per square foot. Kid's Play also received a substantial rent concession totalling $68,830.00 in the first thirty months of the lease which again reduced the effective rent from $6.38 per square foot to $1.36 per square foot, an amount far below any acceptable level of rent, and certainly had no relevance to the market.

Shortly after the commencement of the case, the Debtor sought authority to use cash collateral, i.e., the rents collected from the tenants of the shopping center. On July 23, 1992, this Court entered an Order and granted the Debtor's Motion to use cash collateral provided, however, that the Debtor pay the Bank adequate protection in the amount of $62,000.00 a month. The Order also granted the Bank a postpetition lien on the rents collected by the Debtor from the tenants of the shopping center. The Motion for relief filed by the Bank was denied.

On November 2, 1992, the Debtor filed its first Plan of Reorganization. This Plan and others were ultimately superseded by the current Plan of Reorganization filed on January 15, 1993, entitled Second Amended Plan of Reorganization. Article 3 of the Second Amended Plan and Disclosure Statement lists four classes of creditors, Class 1 is the Bank; Class 2 are general unsecured creditors whose claims are equal or greater than $500.00; Class 3 consists of claimants whose claims are less than $500.00; Class 4 are the equity secured holders. The Plan also provides that the creditors in Class 1, 2, and 3, are impaired and they are entitled to vote. The Disclosure Statement accompanied this Second Amended Plan of Reorganization which was ultimately approved and the Court scheduled a hearing to consider confirmation of the Second Amended Plan. Prior to the confirmation hearing, the Bank filed a Motion to Value its Collateral.

On February 24, 1993, this Court entered an Order and determined that the value of the shopping center is $11,000,000.00 Based on this Order, the Bank filed a secured claim in that amount and an unsecured claim in the

amount of $371,881.71. In addition, in an effort to block confirmation the Bank purchased claims in Class 3 totalling $1,220.00. In due course the Debtor objected to the Bank's unscheduled claim. The Court sustained the Objection and disallowed the Bank's unsecured claim on the basis that the post-petition adequate protection payments paid by the Debtor to the Bank should be applied to the pre-petition unsecured claim of the Bank. This Order is currently on appeal and still pending in the United States District Court.

As a result of the disallowance of the unsecured claim of the Bank, the Debtor modified the Plan's treatment of the Bank's Class 1 claim which provided that the Bank would retain its lien on the shopping center and will be paid interest on its allowed secured claim at a fixed rate of 7½%, with contingent principal reduction payments equal to one-half of the Debtor's net cash flow. The Plan defined the net cash flow as that amount available after all operating expenses, capital reserve, and Plan payments have been paid. The contingent amortization of the principal totals $600,000.00 over the five-year life of the Plan and in effect would equal an amortization schedule of 30 years. The Plan further provides that the outstanding principal balance owed to the Bank would balloon in five years, at which time the Debtor proposes to sell or refinance the property. Under the Debtor's projections, the Debtor must sell or refinance the property at the end of the Plan for at least $10,400,000.00.

The Bank objected to the Plan on the following grounds: (1) the Plan is not fair and equitable in that it fails to provide a payment to the Bank at market rate of interest on its secured claim or treat its secured claim pursuant to market terms; (2) the Plan was not feasible; (3) the Plan unfairly discriminates against the Bank's secured and unsecured claims; (4) the Plan improperly classified unsecured claims for the sole purpose of gerrymandering unsecured claims in order to create an impaired class which would vote in favor of the Plan; (5) the Debtor failed to obtain the vote of an impaired class of claims; (6) the Plan was proposed in bad faith, and (7) the Plan violates the absolute priority rule.

■ It should be noted at the outset that in order to confirm a plan of reorganization, a debtor has the burden of proof as to each element of § 1129(a) of the Bankruptcy Code. *In re Briscoe Enterprises Ltd., II,* 138 B.R. 795, 804 (N.D.Tex.1992); *In re S.A.B.T.C. Townhouse Ass'n, Inc.,* 152 B.R. 1005, 1008 (Bankr.M.D.Fla.1993); *In re MCorp. Financial, Inc.,* 137 B.R. 219, 225 (Bankr.S.D.Tex.1992).

### Good Faith of the Plan Proponent
### § 1129(a)(3)

■ In considering confirmation of a Plan of Reorganization, the threshold question is whether or not the Plan was proposed in good faith, § 1129(a)(3) and the Court must make an independent determination of the good faith of the proponent of the Plan. This is especially true when the good faith of the Debtor is challenged which is the case in the present instance.

This record reveals that the Bank initially challenged the Debtor's right to seek relief under Chapter 11 on the grounds that the Petition was not filed in good faith, thus subject to dismissal for "cause" pursuant to § 1112(b) and the legal principles developed by case law. *In re Albany Partners Ltd.,* 749 F.2d 670 (11th Cir.1984); *In re Little Creek Development Co.,* 779 F.2d 1068, 1073 (5th Cir.1986); *In re Natural Land Corporation,* 825 F.2d 296 (11th Cir.1987); *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393 (11th Cir.1988); *In re Krilich & Soltesa/Brandt Development Co.,* 87 B.R. 178 (Bankr. M.D.Fla.1988); *In re Punta Gorda Associates,* 143 B.R. 281 (Bankr.M.D.Fla.1992); *In re Metro Palms,* 153 B.R. 922 (M.D.Fla. 1993).

This Court denied the Motion because it appeared that even though this is a single asset case and had the earmark of similar cases which were dismissed for bad faith filing, there appeared to be some economic value worth salvaging. Thus, this Court was satisfied at that time that the Debtor should be given one opportunity to obtain confirmation of a Plan and achieve reorganization.

Obviously, this ruling did not establish this Debtor's good faith in general and was not intended to find that the Debtor filed the Petition for Relief in good faith for all purposes. For this reason, whether or not the Second Amended Plan was filed in good faith is still an open question and proper for consideration.

This Court is reluctant to find that the Second Amended Plan was filed in good faith for the following reasons. First, a proposal to restructure a mortgage encumbering a distressed commercial property by an owner whose operating history, to say the least, is spotty and heavily clouded by offering an annual interest rate of 7.5% with a five year balloon amounting to a 30 year amortization is nothing but a visionary scheme and devoid of any valid and realistic basis. This Court is not aware of any Plan which obtained confirmation over objection when a Plan provided for negative amortization with a short term balloon. This Plan theoretically offers the Bank a right to share with the Debtor on a half and half basis in a net operating surplus whether or not such surplus would ever be available is highly questionable, especially in light of the fact that the pro forma filed by the Debtor does not make the proper allocation for capital reserve. Be that as it may, this Plan as structured would reduce the principal indebtedness of $11 Million only by $600,000.00, leaving an outstanding balance on principal at the end of the five year term of $10,400,000.00, plus the accrued interest.

This leads to the issue of feasibility.

█ Section 1129(a)(11) requires that the Court make an affirmative determination and finding that a Plan is feasible except when a Plan of Reorganization provides for total liquidation of all assets of the Debtor. The Debtor's Second Amended Plan is challenged by the Bank on the basis that the Debtor has failed to establish with the requisite degree of proof that the Plan is feasible, which is a mandate requirement in § 1129(a)(11) of the Code.

█ When evaluating feasibility of a plan of reorganization, the Court must consider the earning power of the business, its capital structure, the economic conditions of the business, the continuation of present management, and the efficiency of management in control of the business after confirmation. *In re Sovereign Oil Co.*, 128 B.R. 585 (Bankr.M.D.Fla.1991); *In re Mulberry Phosphates, Inc.*, 149 B.R. 702 (Bankr. M.D.Fla.1993); *In re Briscoe Enterprises Ltd., II*, 138 B.R. 795 (N.D.Tex.1992); *In re Clarkson*, 767 F.2d 417 (8th Cir.1985).

Under the proposed Plan the Debtor is required to pay all administrative and unsecured claims pursuant to the terms of the Plan, the Debtor would be required to pay a total of $199,637.80 to these claimants in 1994. (100% of administrative claims totalling $158,260.96, 90% of Class 3 claims totalling $5,296.91, and 50% of Class 2 claims totalling $73,219.23). Using the projected 1994 gross cash flow as contained in the Bank's pro forma, the Debtor would have $365,734.20 in cash flow to service payments on the Bank's secured claim. (Bank Trial Exhibit 10). This remaining cash flow would only be sufficient to make interest only payments to the Bank at 3.32% with no amortization of principal. It is without doubt that such treatment of the Bank's secured claim is grossly inadequate, unfair and inequitable.

If the Debtor is required to pay the Bank a current market rate of interest at a minimum of 9.5% with a 15 year amortization, the Debtor would have negative cash flow in 1994 of $1,012,652.00. In addition, if the Debtor is required to pay the Bank a market rate of interest at 9.5% with a 15 year amortization, the Debtor would have negative cash flow in excess of $799,593.00 per year during the remaining term of the Plan. (Bank Trial Exh. No. 10). It is clear from the record that the Debtor has too much debt and too little cash flow to service the secured and unsecured claims, and the Plan is not feasible. *See e.g. In re EFH Grove Tower Associates*, 105 B.R. 310 (Bankr.E.D.N.C.1989)— projected value of building two years in future was too speculative to be meaningful in deciding whether value of building was adequately protected against risk which Chapter 11 plan would inflict upon mortgagee.

The Debtor concedes, as it must, that the Plan is not feasible if the Debtor is required

to pay more than 7.5% interest and if the amortization schedule proposed is not approved. Even assuming for the purpose of discussion, that the pro forma submitted by the Debtor is correct, this Court is satisfied that a 7.5% interest proposed by the Debtor is unrealistic and on the current market condition, the proper interest rate in all event could not be less than 8.25%, let alone if the Debtor is required to pay 9.5% amortized over 15 years as the Bank suggests.

In addition, the second problem with feasibility is the Debtor's Plan to refinance or sell the property at the end of the five year proposed life of the Plan. Anyone who is even vaguely familiar with the current real estate market should be painfully aware that no institution lender, which is still in business and survived the Savings and Loan (also known as the Thrift) debacle, would grant a loan under the terms proposed by the Debtor or could survive with a forced loan under these terms.

Given the high risk of default and the realistic projected cash flow from the property, under even the best case scenario, giving every benefit of the doubt to the Debtor, in today's market the Debtor could only obtain a loan of $6,200,000.00 at 350 basis points over a five-year treasury note which, as of March 21, 1994, equaled approximately 9.5% and that such loan would amortize over 15 years and balloon in 5 years. The remaining portion of the secured claim of $4,800,000.00 could be financed only through a second mortgage at a minimum interest rate of at least 15%, if not higher, and an amortization schedule and balloon payment corresponding to the first lien mortgage. As such, the blended market rate of interest on the first and second mortgage for the Bank's $11 Million secured claim would be 11.91%, with such loan amortizing over 15 years and a balloon in five years.

The Third problem with the feasibility which also reflects by the way on the good faith of the Debtor, involves the mysterious treatment, actually non-treatment, of an indebtedness in the amount of $18,451,836.20 to EOB. This liability was originally scheduled by the Debtor as undisputed but later on, by an amendment, was rescheduled as disputed.

It is not seriously disputed that the Debtor is indebted to EOB in that amount and the only reason it was rescheduled as disputed is because Ms. Laubitz was unable to contact EOB. EOB was not scheduled with a current address and the only address indicated is an address of a New York law firm who might have represented EOB at one time. Thus it appears that EOB may have never received the proper notice, especially the notice of the bar date to file claims.

Due process requires that debtor's known creditors be given actual notice of the claims bar date before a debtor can discharge its debt. *City of New York v. New York, New Haven & Hartford R.R.*, 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953); *In re Charter Co.*, 125 B.R. 650 (M.D.Fla.1991). In the present case, EOB was never given notice of the bar date and, as such, its claim is not bound by the Plan. The fact that the Debtor gave notice to EOB of the bankruptcy at the address of counsel the Debtor believed represented EOB, when the Debtor had actual knowledge of EOB's true address, is insufficient to bind EOB to the term of the Plan. Thus the EOB claim would survive a confirmation if confirmation is granted which would have been an additional fact bearing on the feasibility of the Debtor's Plan because the Debtor certainly would not have funds post-confirmation to meet this obligation.

### Motion for Cram–Down § 1129(b)

Ordinarily if the Debtor failed to establish with the requisite degree of proof that it met all the preconditions for confirmation set forth in § 1129(a) which is not the case in the present instance, this would end the inquiry because the debtor could resort to the cramdown provision only if the only road block to confirmation is the Debtor's inability to overcome a rejection by an impaired class which is in this instance the Bank. Notwithstanding this Court is satisfied that it is appropriate to briefly discuss the Debtor's attempt to utilize § 1129(b)(2)(A).

This Section requires a convincing showing that notwithstanding the Debtor's inability to obtain an affirmative vote from

the Bank, the Plan could be confirmed because the Plan does not discriminate unfairly and the treatment of the Bank's claim is fair and equitable. In addition, subsection (iii) of § 1129(b)(2)(A) provides that the Plan must provide that the Bank realizes the indubitable equivalent of its claim.

### Fair and Equitable § 1129(b)(2)(A)

■ The term fair and equitable is defined by § 1129(b)(2)(A) which provides that before the Court may find the Plan fair and equitable, the Plan must provide that the Bank retain its lien, that the Bank will receive property of the value equal to the allowed secured claim. *In re Bryson Properties, XVIII*, 961 F.2d 496, 500 (4th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134; *In re Birdneck Apartment Associates, II, L.P.*, 156 B.R. 499, 507 (Bankr. E.D.Va.1993); *In re Briscoe Enterprises Ltd., II, supra.*

The property the Bank is to receive under the Plan if the Plan is confirmed is to be valued as of the effective date of the Plan. In determining whether or not the provision for the payment of an allowed secured claim is fair and equitable if the payments will be deferred payments it is necessary to determine the value the Bank is to receive over the life of the Plan. In order to determine this value the Court must consider the time value of the money which in turn could be determined by the interest rate the Plan proposed to pay on the allowed secured claim.

■ The present value or the market rate of interest must be determined with reference to the similar terms, duration, the collateral and the risk to the lender. *In re Southern States Motor Inns, Inc.*, 709 F.2d 647 (11th Cir.1983); *In re Birdneck Apartment Associates, II, L.P., supra; In re Ropt Ltd. Partnership*, 152 B.R. 406 (Bankr. D.Mass.1993); *In re Pinebrook, Ltd.*, 85 B.R. 160 (Bankr.M.D.Fla.1988). There is hardly any question not only that the Plan as proposed is not fair and equitable but would not enable the Bank to realize the indubitable equivalent of its claim and would certainly not receive in the deferred cash payments totaling at least the allowed amount of its claim, both of which are requirements for cram-down under § 1129(b)(2)(A)(ii) and (iii).

In light of the foregoing it is unnecessary to consider additional objections of the Bank, one relates to alleged improper classification of unsecured claims and that the Second Amended Plan violates the absolute priority rule.

■ The last challenge of the Bank is based on the contention that the Second Amended Plan violates the absolute priority rule. The standard for "fair and equitable" encompasses the judicially created absolute priority rule, which has been defined as follows:

> The absolute priority rule, in its simplest terms, requires that a creditor of a debtor in bankruptcy reorganization receive payment of their claim in their established order of priority, and that they receive payment in full before lesser interests— such as those of equity holders—may share in the assets of the reorganized entity.

David M. Mowlon, Arnold H. Wuhrman, "The New Value Exception to the Absolute Priority Rule: Is *Ahlers* the Beginning of the End," 93 *Commercial Law Journal* 303 (Fall 1988); see also *In re Johnson*, 101 B.R. 307 (Bankr.M.D.Fla.1989); *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). Case law indicates that there may still exist an exception to the absolute priority rule which permits a junior class of claimholders to receive payments or retain property, without full satisfaction of the allowed claims of a senior class, to the extent the junior claimholder pays sufficient "new value." *In re Potter Material Service, Inc.*, 781 F.2d 99 (7th Cir.1986); *In re S.A.B.T.C. Townhouse Ass'n, Inc., supra; contra In re Jack Sidney James*, 1992 WL 21365 (Bankr.M.D.Fla.1992); *In re Greystone III Joint Venture*, 948 F.2d 134, 139 (5th Cir.1991) withdrawn in part, reinstated in part on rehearing, 995 F.2d 1274 (1991) *cert. denied*, —— U.S. ——, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992).

The Second Amended Plan provides that the Debtor's equity shareholders will retain their equity interest and be entitled to receive 50% of the property's net cash flow while the Bank's secured claim remains unpaid and unsatisfied under the Plan and the unsecured claims which the Bank purchased receive only 90% of their allowed amounts and the Debtor's shareholders will retain their equity interests and the right to receive distributions under the Plan without providing any "new value" to the Debtor. The Plan clearly violates the absolute priority rule. *In re Miami Center Associates, Ltd.*, 144 B.R. 937 (Bankr.S.D.Fla.1992); *In re Lakeside Global II, Ltd.*, 116 B.R. 499 (Bankr.S.D.Tex. 1989).

In sum, this Court is satisfied that even if this Court's finding concerning the lack of good faith of the Debtor's proposed Plan and in concluding that the Plan is not feasible is not supported by the record, a point not considered, and it is clear that the Debtor did not meet the requirements of § 1129(b) for cram-down and for this reason this Plan cannot be confirmed.

This leaves for consideration whether or not the Bank's Motion to Dismiss or Convert this Chapter 11 case and its Motion for Relief From Automatic Stay should be considered at this time in light of the conclusions set forth should be favorably considered. As noted earlier, this is a single asset case and virtually, if not all, of the assets of the Debtor are fixed and encumbered by a secured claim of the Bank, thus theoretically it would be fruitless to convert this case to a Chapter 7 case since there wouldn't be any property available to the Trustee to liquidate and administer to the benefit of the few unsecured creditors. It is clear from this record, the Bank is entitled to be granted relief from the automatic stay based on § 362(d)(2) of the Code so that the Debtor has no meaningful equity in the subject property and the same is needed for effective reorganization since as noted, none of them is possible. For this reason this Court will enter a separate Order on the Bank's Motion to Lift the Automatic Stay and grant same.

However, the Bank's Motion to Convert this case to a Chapter 7 presents a different problem. F.R.B.P. 2002(a)(5) while this rule generally requires 20 days notice to parties of interest, a hearing on the dismissal still requires albeit not 20 days notice for conversion of the case to another Chapter.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Objection to Confirmation of the Second Amended Plan of Reorganization filed by Berliner Handels-und Frankfurter Bank be, and the same is hereby, sustained, and confirmation of the Second Amended Plan of Reorganization be, and the same is hereby, denied. It is further

ORDERED, ADJUDGED AND DECREED that a hearing shall be scheduled forthwith to hear argument as to whether or not this case should be dismissed or converted to a Chapter 7 liquidation case.

DONE AND ORDERED.