**SPCP GROUP, LLC, Appellant,**

**v.**

**CYPRESS CREEK ASSISTED LIVING RESIDENCE, INC., and Cypress Creek Assisted Living Residence Management, LLC, Appellees.**

No. 8:09–cv–2189–T–RAL.

United States District Court,
M.D. Florida,
Tampa Division.

April 9, 2010.

---

### *ORDER*

RICHARD A. LAZZARA, District Judge.

This is an appeal from a final order entered on September 16, 2009, confirming

plans of reorganization of the Debtors–Appellees in a Chapter 11 bankruptcy case, which granted a motion for cramdown. (Dkt. 1). Before the Court are (1) the initial brief of SPCP Group, LLC (SPCP), a secured and unsecured creditor in the bankruptcy case (Dkt. 9), (2) the Debtors–Appellees' answer brief (Dkt. 12), and (3) SPCP's reply brief. (Dkt. 17). After careful consideration of the briefs, the record on appeal, and the applicable law, the Court concludes that the order of confirmation granting the cramdown should be affirmed.

## PARTIES and INTERESTS

Appellees Cypress Creek Assisted Living Residence, Inc. (Residence) and Cypress Creek Assisted Living Residence Management, LLC (Management) are the debtors in a Chapter 11 bankruptcy case, 8:08–bk–19481–MGW.[1] Residence is an assisted living facility (ALF) in Sun City, Florida, with 110 beds, with occupancy during the bankruptcy ranging from 86 to 93 beds. Residence owns the assets of the business and Management manages and operates the ALF with just over forty contract employees. James J. Biggins, Jr., is the president of both the Residence and Management entities. Biggins now runs the day-to-day operations and manages the finances for both entities. Each entity has the same shareholders, which are Biggins and his three siblings.[2]

SPCP held an unsecured claim against Management in the amount of $5,806,833.39, for a guaranty executed by

Management for the obligations of Residence to SPCP. SPCP held a secured claim against Residence in the amount of $5,552,332.96, for a renewal note executed by Residence in favor of Marshal and Ilsley Bank (M & I). The renewal note is secured by a mortgage on the property that constitutes the ALF. The note was guaranteed by several of Biggins' family members. M & I transferred all of its interest in the note and mortgage, and all the related guaranties, to SPCP. Residence defaulted on the note, and SPCP filed a foreclosure action. The action precipitated the Debtors filing Chapter 11 petitions.[3]

## PLANS OF REORGANIZATION

The plan of reorganization for Residence designates the secured claim of SPCP as its own class and states that the claim shall be "paid one hundred percent (100%) together with interest as the current market rate of interest at the time of Confirmation as determined by the Bankruptcy Court." The non-default contract rate of interest under the note held by SPCP was 5.5% before the bankruptcy court determined otherwise pursuant to the motion for cramdown. The plan further provides that the full claim of SPCP would be "amortized over a period of 20 years and payable in monthly installment, provided that the full balance owed together with any accrued interest will balloon and be fully due and payable 72 months following Confirmation."[4] Neither plan provides how the

1. Residence filed its voluntary petition under Chapter 11 in December 2008, and Management followed suit in February 2009. The cases were consolidated in March 2009.

2. One of his siblings' interest has been transferred to a trust based on his expropriation of nearly $700,000.

3. Various factors led to the filing of the bankruptcy including three wrongful death claims

filed against the Debtors, one of the Biggins' family members' borrowing money from the Debtors, which debt was never repaid, Mr. Biggins' ex-wife's use of the Debtors' funds for personal purchases, and, most notably, the maturation of the note with a balloon payment owed to SPCP.

4. The plan of reorganization for Management designates the unsecured claim of SPCP as its own class and states that the "real property is

$4,313,686.63 balloon payment in six years will be funded.

### BANKRUPTCY COURT'S RULING

The bankruptcy court made the following oral findings on the record and incorporated them into his written order on appeal. The court summarized the history preceding the bankruptcy filing and noted that the Debtors had successfully compromised the three wrongful death claims, two each for $25,000, payable at the rate of $1,000 per month and the third to be paid by the insurance company. (Dkt. 3, Vol. 82009 at p. 35). The court valued the ALF at $5.4 million, noting that the disclosure statement listed the value as $6 million and Mr. Biggins testified at his deposition just prior to the final hearing at $7.5 million. (Dkt. 3, Vol. 82009 at p. 36). The court noted specifically that "SPCP determined not to put on an expert on value." (Dkt. 3, Vol. 82009 at p. 36). Post-petition, the Debtors had been able to pay its post-petition obligations and adequate protection to SPCP in the amount of $34,375 per month, which is 7.5 per cent interest only on $5.5 million. (Dkt. 3, Vol. 82009 at p. 36). The Debtors have also been paying the real estate taxes through escrowing one-twelfth of the $5,800. (Dkt. 3, Vol. 82009 at p. 37).

The Debtors' cash on hand as of July 31, 2009, was $183,355. (Dkt. 3, Vol. 82009 at p. 37). The Debtor's census had grown from 83 to 85 in December 2008 to 90 at the time of the hearing in August 2009, out of a 110–bed ALF. The Debtors had recently hired a marketing director at the time of the hearing. (Dkt. 3, Vol. 82009 at p. 37). The court noted that the plan provided for 100 percent payment of the $5.5 million claim of SPCP, using a 20–year amortization with an interest rate of 5.5 percent and a balloon payment in 72

months. (Dkt. 3, Vol. 82009 at p. 37). The plan had the necessary votes of all affected creditors but for SPCP, which required the application of the cramdown provision, 11 U.S.C. § 1129(b). (Dkt. 3, Vol. 82009 at p. 39).

Based on the above findings, the court first ruled that the plans were feasible under 11 U.S.C. § 1129(a)(11). (Dkt. 3, Vol. 82009 at pp. 40–41). As part of that determination, the court found that there is a substantial likelihood that the Debtor can make the payments under the plans and therefore will likely not need to seek further reorganization. After determining that the plans were feasible, the court next made findings under the cramdown provision of 11 U.S.C. § 1129(b). (Dkt. 3, Vol. 82009 at p. 41).

The court applied a present value analysis under the cases interpreting the cramdown provision applicable to secured creditors, 11 U.S.C. § 1129(b)(2)(A)(i)(I). The court began its analysis of present value of the claim with *In re Southern States Motor Inns, Inc.,* 709 F.2d 647 (11th Cir. 1983), which, although it does not deal with the cramdown of a secured creditor, does involve construing the same language—"effective date of the plan"—in another statute. The Eleventh Circuit in *Southern States* held that in determining the interest rate for the loan, the court "must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default." 709 F.2d at 651.

The bankruptcy court summarized the following history of methodologies used in arriving at the market rate upon which the interest to be charged is based. Courts in the past had developed four different methodologies, which are addressed at

owned by Residence and has a value greater than the amount owed to SPCP."

length in *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004). One of the methods, the coerced loan theory, has been criticized in *In re Byrd Foods, Inc.*, 253 B.R. 196 (Bankr. E.D.Va.2000), as did the Supreme Court in *Till*. In discussing the formula, or time value of money, method, the *Till* Court noted that the national prime rate is adjusted to compensate for the circumstances of the bankruptcy estate, the nature of the security, and the duration and feasibility of the reorganization plan. *Till*, 541 U.S. at 479, 124 S.Ct. 1951. The Court held that the formula method, which is adding one to two percent to the national prime rate, is the proper method to determine the interest rate in a cramdown under Chapter 13. *Till*, 541 U.S. at 479, 124 S.Ct. 1951. Till did not answer, however, what method should be used to determine the interest rate in a Chapter 11 cramdown.

The bankruptcy court noted the two seemingly contradictory portions of the *Till* opinion. (Dkt. 3, Vol. 82009 at pp. 46–47). While the *Till* opinion initially observes that Congress intended for bankruptcy judges to follow the same approach—discounting a stream of deferred payments to present value—when determining interest rates, later, in a footnote, the opinion specifically differentiates between Chapter 13 and Chapter 11 cramdowns. *Till*, 541 U.S. at 474, 124 S.Ct. 1951. In Chapter 13 cases, there is no free market of willing cramdown lenders; yet, in Chapter 11 cases, there may be an "efficient market" that would warrant an interest rate different from that calculated under the formula approach. *Till*, 541 U.S. at 476 n. 14, 124 S.Ct. 1951.

The bankruptcy court next discussed subsequent cases that have wrestled with the language of *Till*. The court cited *In re American HomePatient, Inc.*, 420 F.3d 559 (6th Cir.2005), *In re Prussia Associates*, 322 B.R. 572 (Bankr.E.D.Pa.2005), and *In re Winn–Dixie Stores, Inc.*, 356 B.R. 239 (Bankr.M.D.Fla.2006) as a backdrop against which to determine the proper method for determining the interest rate to be applied in this particular Chapter 11 case. (Dkt. 3, Vol. 82009 at pp. 47–49). The bankruptcy court would first determine whether an efficient market exists. If an efficient market exists, then the rate produced by the market would be the cramdown interest rate. If an efficient market does not exist, then the bankruptcy court would use the formula approach set forth in *Till*. (Dkt. 3, Vol. 82009 at p. 48).

Having interpreted the case law, the bankruptcy court found that an efficient market did not exist. (Dkt. 3, Vol. 82009 at p. 49–56). The bankruptcy court found the Debtors' expert, Mr. Healy, reliable under the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and believed his experience in the marketplace made his testimony credible that the lenders are still pessimistic and are taking a "wait-and-see approach." (Dkt. 3, Vol. 82009 at p. 49). The court found Mr. Son, SPCP's expert, well-qualified to testify; however, he did not find the facts and data relied upon by Mr. Son persuasive. (Dkt. 3, Vol. 82009 at pp. 51–53). Specifically, the court found that his testimony lacking with respect to particular examples of loans in the categories of REIT leases, HUD–232s, and conventional bank loans, all three of which he had listed as possible financing tools to structure a loan for an ALF. The bankruptcy court found that the facts and data relied upon by Mr. Son were wanting such that the evidence did not pass the *Daubert* test. The court further made a finding that Mr. Son's testimony lacked objectivity and became personal and negative against Mr. Healy and the Debtors. (Dkt. 3, Vol.

82009 at pp. 53–55). The court stated, "[n]o one testified about what's going on in the marketplace except Mr. Healy who said there's nothing going on in the marketplace." (Dkt. 3, Vol. 82009 at pp. 55–56). The judge confirmed his experience from the bench:

> [T]hat's pretty believable because I live in the world of Chapter 11s here and I'm not seeing anybody getting exit—cramdown financing coming out of 11s. I used to, but I don't anymore. And I thought that was frankly fairly credible.

(Dkt. 3, Vol. 82009 at p. 56).

Having found Mr. Healy's testimony more credible than Mr. Son's, the bankruptcy court then applied the formula approach in the face of the nonexistence of an efficient market. (Dkt. 3, Vol. 82009 at p. 56). In determining the interest rate at prime plus one to three percent, the court noted that the Debtors had ample cash flow and had been paying the interest at 7.25 percent, although not amortized. The court set the interest rate at prime plus two, or 5.25 percent. (Dkt. 3, Vol. 82009 at pp. 56–57). He commented as follows:

> Now, there's been much made that there's been no arrangements or explanation as to how the refinancing's going to be done in six years. And that's true. I'm not sure what that evidence would be. If there's no market today, then what would your evidence be would be what the market is going to be in five years?
>
> I think the Debtors' game plan is that hopefully in five years the market will turn around, there will be an efficient market. And the Debtor, being out of Chapter 11, with a track record, will be able to refinance, and also with its other management problems taken care.

(Dkt. 3, Vol. 82009 at p. 58).

The court placed a value on the ALF of $5.4 million:

And there's one other important aspect of this, and that is what is that interest rate to be applied toward.

And as I've indicated, there were—the value of the property has been stated differently at different times during this case. The most recent was the 5.5. million, I believe, that Mr. Biggins testified to at the trial.

The bank made a tactical decision not to put an expert on, and so I can't give any weight one way or the other to the bank's view.

The last evidence—given the various evidences that I have, the last evidence I have is that of Mr. Biggins as the owner. It's certainly competent evidence. I have to weigh the fact that he'd given other opinions at prior times. It was 9 million in the schedules. There was, I think, 6 million in the disclosure statement, 7.5 million at his deposition, and then 5.4 million he testified to based on recent information that he had seen.

It's not the evidence that I would give more weight to than an expert. I certainly would not consider Mr. Biggins as competent as an expert, but it's still competent evidence. Rule 702 recognizes, in the advisory notes, that parties can still bring in qualified experts—qualified opinions through owners or presidents of corporations. And therefore I'll accept his last value of five point—I think it was 5.4 million actually. 5.4 million as being the value of the property for purposes of confirmation.

(Dkt. 3, Vol. 82009 at pp. 58–59). This timely appeal followed.

### STANDARD OF REVIEW

■ The district court reviews *de novo* the legal conclusions of the bankruptcy court. *See In re JLJ Inc.,* 988 F.2d 1112, 1116 (11th Cir.1993). The district

court reviews a bankruptcy court's findings of fact under the clearly erroneous standard, keeping in mind that the trial judge is "best able to assess the credibility and evidentiary content of the testimony of the witnesses before him." *In re Hawley*, 51 F.3d 246, 248 (11th Cir.1995); Fed. R.Bankr.P. 8013. "A finding of fact is clearly erroneous when, 'although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed.'" *Crawford v. Western Elec. Co., Inc.*, 745 F.2d 1373, 1378 (11th Cir.1984). The admissibility of expert evidence is reviewed under an abuse of discretion standard. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 556 (11th Cir.1998).

## ISSUES ON APPEAL

SPCP raises six issues on appeal, including (1) whether the plans of reorganization are feasible under 11 U.S.C. § 1129(a)(11) based on clear and convincing evidence, (2) whether the plans of reorganization would not impair SPCP and would be fair and equitable as mandated by 11 U.S.C. § 1129(b), (3) whether a debtor must attempt to obtain post-petition financing to establish an efficient market does not exist for exit financing, (4) whether expert Mark Healy's testimony should have been excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), (5) whether the court erred in applying the formula under *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004), and (6) whether the collateral was properly valued at $5.4 million.

## ANALYSIS

*Feasibility of the Plans*

■ SPCP raised in final argument that the Debtors had failed to show by competent clear and convincing evidence that the proposed plans were feasible—that the Debtors were not likely to be liquidated or further reorganized after the imposition of the plans. (Dkt. 3, Vol. 82009 at pp. 6–7). SPCP takes issue with the following specific deficiencies in the plans: (1) the absence of evidence that the Debtors will be able to pay the balloon payment in six years and (2) the speculative nature of the Debtors' pro forma projections.

Regarding the balloon payment, SPCP challenges the lack of a guarantor to back the balloon payment as well as the lack of pro forma projections for the year in which the note balloons and the lack of proof of financing six years from the date of confirmation. SPCP contends that the Debtors must explain exactly how the balloon payment will be funded in six years, citing *In re Inv. Co. of Southwest, Inc.*, 341 B.R. 298, 316 (10th Cir. BAP 2006), in which the court observed that a court needs some evidence to explain how balloon payments are to be reasonably funded. As to the lack of lack of pro forma projections beyond 2013 and the speculative nature of the projections, SPCP urges that the court failed to take into consideration the rise of the proportion of Medicaid or diversion patients, which do not bring in the amount of money as do private paying patients.

■ In assessing the feasibility of a plan of reorganization, the bankruptcy court must consider the "earning power of the business, its capital structure, the economic conditions of the business, the continuation of present management, and the efficiency of management in control of the business after confirmation." *In re D & G Invs. of West Fla., Inc.*, 342 B.R. 882 (Bankr.M.D.Fla.2006) (citing *In re Immenhausen Corp.*, 172 B.R. 343, 348 (Bankr. M.D.Fla.1994)). While the plans in *D & G* and *Immenhausen* were not found to be

feasible, the facts of those cases are distinguishable from the instant case. In *D & G*, the debtor's pro forma statements of operations were based on income derived from selling sand and dirt on the property, activities which were unapproved by the county. *D & G*, 342 B.R. at 886. In *D & G*, the debtor was clearly relying on obtaining financing during the two-year life of the plan and its goal of developing the property into a subdivision with ranch-style homes was unattainable given the then-current state of the undeveloped property for which rezoning had not been applied. *D & G*, 342 B.R. at 886–87. In *Immenhausen*, the plan was not feasible because the interest payments would have clearly placed the debtor in a negative cash flow position. *Immenhausen*, 172 B.R. at 348. The debtor there owned a shopping mall, but no operating surplus existed from which to pay the loan, and any outstanding balance reduction was paid through third party sources. *Immenhausen*, 172 B.R. at 345.

The record supporting the bankruptcy court's ruling shows that the Debtors had increased the census of the ALF and had increased revenue during the time of the Chapter 11 cases. The Debtors had been making monthly payments of $34,750 to SPCP, and under the plans, SPCP was going to be paid 100 percent of its claims. The Debtors had accumulated approximately $180,000 in cash over the course of the cases, and each month, one-twelfth of the property taxes, which was $5,800, was escrowed for annual payment. The change in management to Mr. Biggins exclusively, without the interference of his siblings, would appear to have been working well based on the Debtors' ability to pay for all operating costs and SPCP's monthly payments at the time of the final hearing. (Dkt. 3, Vol. 81409 at pp. 66 & 75).

Apart from the Debtors' ability to make its payments to all creditors at the time of the hearing, it is abundantly clear from the record that the bankruptcy court took into consideration the time before the balloon payment was due, six years, and noted that historically, while an efficient market may not be in existence on the date a plan is confirmed, markets do change over time. The court simply acknowledged that markets do turn around, and, coupled with the Debtors' recent track record of payment, the increase in the census of the ALF, its recent hiring of a marketing manager, and its management now limited to Mr. Biggins alone, the court found that if the Debtors continue on its current path, then it should be able to refinance at the time the balloon comes due, if unable to cover the payment. Thus, this Court finds that the bankruptcy court did not err in finding the plans feasible when the evidence presented was not too speculative regarding the Debtors' ability to make the balloon payment in six years.

*Impairment as to SPCP*

SPCP contends that the lower interest rate chosen for the cramdown loan necessarily impairs SPCP because it is lower than the interest of the original loan. The interest rate chosen must both compensate for present value and insure the safety of the principal. *See In re Monnier Bros.*, 755 F.2d 1336 (8th Cir.1985) (citing *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir.1935) and other subsequent cases). SPCP, however, did not object to their impairment at the hearing and cannot now seek to change the terms of the plans through arguing for a higher interest rate per se. The Debtors' present management in place and the recent history of meeting its financial obligations lend support for the bankruptcy court's implicit finding that SPCP was not impaired. The formula for arriving at the 5.25 percent

interest rate will be specifically addressed below.

### An Efficient Market

SPCP contends that debtors must have unsuccessfully attempted to obtain post-petition financing in order for the court to make a finding that an efficient market does not exist. SPCP relies on many cases in which the debtors had sought an exit loan. Because the Debtors did not present evidence of at least trying to find exit financing, SPCP argues, the bankruptcy court erred in making its determination regarding an efficient market.

After reviewing the cases cited by SPCP, and *Till*, this Court finds no absolute mandate that a Chapter 11 debtor must attempt to find exit financing before the bankruptcy court can determine whether an efficient market exists. There is no error in relying on expert testimony to establish whether an efficient market exists for exit, or cramdown, financing. In crediting Mr. Healy's testimony, as opposed to Mr. Son's, the bankruptcy court did not abuse its discretion.

### Testimony of the Competing Experts Healy and Son under Daubert

The bankruptcy court found the following testimony of Mark Healy credible and reliable, sufficient to withstand any *Daubert* objections. Mr. Healy, over objection, testified regarding the existence of an efficient market for Chapter 11 exit financing, and in the event he found such market did not exist, he would then opine on an appropriate cramdown interest rate adjustment to the loan at issue. (Dkt. 3, Vol. 81409 at p. 147). Although Mr. Healy has not dealt with the financing of ALFs in particular, he has sixteen years of general commercial banking experience. Counsel for the Debtors stated his intention to offer Mr. Healy's report and opinion for the current and historical prime rates and treasury bill rates, the historical methodology used in the commercial loan market to price loans, and the current credit industry. (Dkt. 3, Vol. 81409 at pp. 144 & 146–147). The Debtors' Counsel argued that Mr. Healy's experience in commercial lending enabled him to render a reliable opinion regarding the interest rates in a current market. (Dkt. 3, Vol. 81409 at p. 145).

Counsel for SPCP objected to Mr. Healy's qualifications as to giving an opinion with respect to the Debtors, the loan, or the market. (Dkt. 3, Vol. 81409 at p. 143). SPCP objected to his lack of a factual basis, specifically the lack of familiarity with the "historical, existing or prospective financial projections," the "strength or lack of strength of the guarantors" and "the value of the collateral" with respect to these particular debtors and this particular ALF loan. (Dkt. 3, Vol. 81409 at p. 143). Counsel for SPCP took issue with Mr. Healy testifying as to the existence of an efficient market based on his lack of knowledge of the risk factors associated with the loan at issue and his lack of knowledge of underwriting or lending to ALFs. (Dkt. 3, Vol. 81409 at pp. 149–150 & 153).

The bankruptcy court overruled SPCP's objections, relying on *Daubert* and stating that Mr. Healy "was certainly qualified by his background, training and education to testify about interest rates." (Dkt. 3, Vol. 81409 at p. 151). To the extent SPCP's objection was directed to whether the content of Mr. Healy's opinion testimony should be apply to this case, the court recited the litany of cases construing *Till*: *Southern States, American HomePatient,* and *Winn–Dixie.* The court permitted Mr. Healy to testify regarding the existence of an efficient market for loans. (Dkt. 3, Vol. 81409 at p. 152). The court found Mr. Healy qualified as an expert to

testify about the interest rates in the market, regardless of whether the court later would need to rely on those rates in fixing the interest rate of the loan. (Dkt. 3, Vol. 81409 at pp. 152–154). Mr. Healy testified that the prime rate was 3.25 percent, and the rate for treasury bills was .5 percent. (Dkt. 3, Vol. 81409 at pp. 159 & 177).

Counsel for SPCP objected again when Mr. Healy began to testify about the credit markets, historically and at present. (Dkt. 3, Vol. 81409 at p. 166). The court overruled the objection, ruling that information about the credit market was relevant in determining whether an efficient market exists for exit financing for Chapter 11 debtors. (Dkt. 3, Vol. 81409 at p. 166). The court emphasized that Mr. Healy's testimony would be heard with a view toward whether there was an efficient market place for exit financing, exclusive of any examination regarding the particular risk factors on this particular loan and regarding the particular formula to be used in setting the interest rate for this particular loan. (Dkt. 3, Vol. 81409 at p. 171). The court clearly distinguished between testimony regarding exit financing in the "real world of post-Chapter 11, no longer a debtor-in-possession," about which Mr. Healy was permitted to testify, and debtor-in-possession lending, about which he was not permitted. (Dkt. 3, Vol. 81409 at p. 172).

Mr. Healy testified he relied on Yahoo Finance articles online as well as some materials from the Wall Street Journal. (Dkt. 3, Vol. 81409 at pp. 173–74). Mr. Healy opined, over objection, that an efficient market for commercial loans in the $5 million to $6 million range does not presently exist. (Dkt. 3, Vol. 81409 at p. 175).

SPCP contends that Mr. Son's testimony with respect to the current market rate was more reliable because Mr. Son considered all of the risk factors specific to this particular loan. The interest rate he attributed to the market ranged from 6.5 percent to the high teens or twenties for distressed debt lenders. (Dkt. 2, Vol. 81409 at p. 241). Contrary to SPCP's position, the bankruptcy court's finding that Mr. Son's testimony was not credible, after listening to it twice, is supported by the record. (Dkt. 3, Vol. 82009 at p. 52). As noted by the court, Mr. Son did not base his testimony on any facts or data concerning specific loans to ALFs. (Dkt. 3, Vol. 82009 at p. 52–53). Rather, he testified about the general markets for financing of ALFs through REIT leases, HUD–232s, and conventional bank loans. (Dkt. 3, Vol. 82009 at p. 53). Mr. Son gave no examples of any deals involving any of the three of these vehicles.

With respect to the bankruptcy court's specific finding that he found Mr. Son's testimony lacked objectivity, the court emphasized the expert's painstaking efforts to color Mr. Healy's testimony in a negative light. (Dkt. 3, Vol. 82009 at pp. 53–54). After listing several examples, the bankruptcy court expressed distaste with Mr. Son's personal attacks on Mr. Healy. (Dkt. 3, Vol. 82009 at pp. 54–55). Thus, the record of the testimony substantiates the bankruptcy court's credibility determination, and no abuse of discretion can be attributed to the court.

Apart from the experts' respective positions, determining whether an efficient market exists does not necessarily entail consideration of the particular risks associated with the particular type of loan or property of the debtor. In this case, evidence was presented that established the market for exit financing in general did not exist, regardless of whether the debtor owned a shopping mall or an ALF. Once the evidence supported the finding that no efficient market existed, the bankruptcy

court properly applied the formula approach as espoused in *Till.*

*The Till formula*

■ This Court agrees with the bankruptcy court's reading of *Till,* as supported by the subsequent decisions from the Sixth Circuit and other courts in the Middle District. The bankruptcy court found, based on credible evidence, that no efficient market existed for Chapter 11 exit financing. Hence, the bankruptcy court applied the formula for Chapter 13 debtors based on the prime rate of interest adjusted by a risk factor and arrived at 5.25 percent. *Till,* 541 U.S. at 478–79, 124 S.Ct. 1951 (articulating the formula approach as beginning with "the national prime rate, ... which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default"). Because the formula approach involves analyzing factors familiar to the bankruptcy court, this approach is the easiest and most straightforward. *Till,* 541 U.S. at 479, 124 S.Ct. 1951. Adjustment within the range of 1 percent to 3 percent has been approved in the past. *Till,* 541 U.S. at 480, 124 S.Ct. 1951. Accordingly, this Court finds no error in the bankruptcy court's arrival at the 5.25 percent interest based on 3.25 prime, as supported by the testimony of Mr. Healy, and a 2 percent adjustment factor to accommodate the difference between a solvent commercial borrower and a reorganized debtor with a plan. On this record, the Debtors have established their current ability to financially operate the ALF and at the same time accumulate cash. This Court finds no error in an interest rate of 5.25 percent.

*Valuation of the Property*

■ SPCP contests as reversible error the court's permitting Mr. Biggins to testi-

fy at the final hearing that the property's value was $5.4 million after looking at an appraisal. As acknowledged by SPCP, the owner is permitted to testify about the value of his property because he has a special knowledge of its worth. *Fed. R.Evid.* 702; *U.S. v. 68.94 Acres of Land, More or Less,* 918 F.2d 389, 397–98 (3rd Cir.1990). As noted by the bankruptcy court, SPCP failed to put on any evidence regarding the valuation of the property. Thus, this Court finds no error with regard to the valuation evidence presented at the hearing.

It is therefore **ORDERED AND ADJUDGED** that the Order Confirming Plan of Reorganization of Cypress Creek Assisted Living Residence, Inc., and Confirming Plan of Reorganization of Cypress Creek Assisted Living Residence Management, LLC (Dkt. 1) is **AFFIRMED.** The clerk is directed to close this case.

**DONE AND ORDERED.**